STATE OF NORTH CAROLINA v. ROGER LEE SMITH

No. 235A88

(Filed 7 February 1991)

1. **Arrest and Bail § 63 (NCI4th) — warrantless arrest — probable cause — victim's description and other circumstances**

   The warrantless arrest of defendant was based on probable cause where a felonious assault and robbery victim told the police that he and a murder victim were robbed and shot by "a black male wearing blue jeans and a blue shirt"; a deputy sheriff driving a patrol car saw a person matching this description two hours later some two miles from the crime scene; defendant fled as the deputy approached him with the patrol car; the deputy called for backup to help search the area where the suspect ran; the search ended when the police discovered a black man running through the woods who matched the victim's and deputy's descriptions; the police called to the man to stop without success and apprehended him after a brief chase; when the deputy asked the suspect his name, he responded that he hadn't shot anybody; and the deputy then searched the suspect and discovered a billfold containing a blank check on the account of one of the victims. Assuming that the victim's vague description of the felon was insufficient to establish probable cause to arrest, the other circumstances of the arrest, combined with the description, made the arrest lawful.

   **Am Jur 2d, Arrest §§ 44-46, 48; Searches and Seizures §§ 92, 93.**

   **What constitutes probable cause for arrest — Supreme Court cases. 28 L. Ed. 2d 978.**

2. **Criminal Law § 75.8 (NCI3d) — second interrogation — failure to repeat Miranda warnings — prior warnings not stale**

   The trial court did not err in finding that *Miranda* warnings given to defendant prior to his first interrogation by police officers had not grown stale at the time of his second interrogation by the sheriff and in concluding that defendant's statements to the sheriff and the fruits of those statements were not inadmissible because defendant was not given renewed *Miranda* warnings prior to the second interrogation.

STATE v. SMITH

[328 N.C. 99 (1991)]

Although evidence that defendant had not slept for thirty hours and had consumed large amounts of alcohol and drugs, that defendant had an IQ of only seventy-nine, that the sheriff was not present at the first interrogation and did not restate defendant's *Miranda* rights, and that there were significant differences in defendant's responses to questions in the two interrogations tended to indicate that the warnings had grown stale, the trial court's finding that the warnings had not grown stale was supported by evidence that the second interrogation followed the first by less than an hour and the sheriff began the interview by asking defendant if he had been advised of his *Miranda* rights; officers offered defendant food and drink before he was interrogated, and defendant accepted a soft drink; the interrogation was conducted in an air-conditioned office; the officers asked defendant if he was under the influence of drugs or other stimulants and defendant responded negatively; an officer advised defendant of his constitutional rights, orally explaining each of the rights to defendant and having defendant initial each right on the waiver of rights form as the right was explained to him; and defendant had been advised of his rights on four occasions prior to his arrest and admitted that he understood his rights on each of those occasions.

**Am Jur 2d, Criminal Law §§ 791-794.**

**3. Criminal Law § 75.2 (NCI3d)— statements by sheriff— confession not involuntary**

Defendant's confession to the sheriff was not involuntary because the sheriff told defendant that the Bible encouraged truth telling, that telling the truth would help with the judge and prosecutor, and that he could get the electric chair where the trial court found, based upon the sheriff's testimony, that no promises were made to defendant. Furthermore, the totality of the circumstances permitted the conclusion that the confession was voluntary where the State's evidence tended to show that the type of "police dominated atmosphere" which can tend to coerce an incriminating statement from a suspect was not present because the police offered him food and drink and took him to an air-conditioned office; an officer advised defendant of his constitutional rights prior to his first interrogation, orally explaining each of the rights to defendant and having defendant initial each right on the waiver of rights

STATE v. SMITH

[328 N.C. 99 (1991)]

form as the right was explained to him; defendant answered that he understood each of the rights and responded negatively when asked if he was under the influence of medicine, narcotics, intoxicating liquor, or other stimulants; when asked whether he wanted to speak to the officers or to see an attorney, defendant stated that he would talk to the officers; defendant was in his early twenties, had completed the ninth grade and had received an electrician's certificate from a technical school; defendant was able to read the waiver of rights form and could understand what it said; defendant had been advised of his rights on four occasions and admitted that he understood those rights when explained to him on the earlier occasions and on the date of his confession; officers gave defendant his *Miranda* warnings at approximately 10:00 a.m. and interrogated him until sometime after 1:00 p.m.; shortly thereafter, the sheriff began his interrogation by asking defendant if he had been advised of his constitutional rights and if he understood those rights, and defendant responded affirmatively to both questions; and any benefits the sheriff mentioned to defendant were in response to defendant's own inquiry.

**Am Jur 2d, Evidence §§ 548, 565, 573.**

4. **Criminal Law § 76.5 (NCI3d) — admissibility of confession — findings as to promises**

The trial court was not required to make findings of fact regarding the sheriff's statement to defendant that he could tell the judge and district attorney that defendant had cooperated where the sheriff's testimony that he made the statement was uncontradicted, and the statement by the sheriff did not render defendant's confession involuntary. While there was a material conflict in the evidence as to whether the sheriff made statements or promises about which defendant testified, the trial court's finding that no promises were made to defendant was, in essence, a finding that the promises about which defendant testified were never made, and this finding supported the conclusion that the confession was freely and voluntarily given.

**Am Jur 2d, Evidence § 585.**

STATE v. SMITH

[328 N.C. 99 (1991)]

5. **Jury § 7.14 (NCI3d) — peremptory challenges — prima facie case of discrimination — rebuttal by State**

A defendant charged with first degree murder, felonious assault and armed robbery established a prima facie case of purposeful discrimination in the prosecutor's exercise of peremptory challenges where the defendant is a young black man and both victims are white; the case attracted much attention; a statement by the district attorney criticizing defense counsel for using fifteen out of sixteen peremptory challenges to excuse white jurors tends to support an inference of discrimination; and although the prosecutor did not use all sixteen of his peremptory challenges, he exercised twelve of the fifteen used to exclude blacks. However, the State rebutted this prima facie case with evidence that the State did not use all of its peremptory challenges, it accepted nine blacks, and the jury was ultimately composed of seven blacks and five whites, and with the prosecutor's explanations that each peremptory challenge was exercised because of concerns for prospective jurors' uncertainties about the death penalty, nervousness in the face of voir dire questioning, prior contact with either defense counsel or the criminal justice system, or having children approximately the age of defendant. Further, the record supported trial court's conclusion that the reasons given by the prosecutor were not pretextual.

Am Jur 2d, Jury § 235.

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

6. **Jury § 7.14 (NCI3d) — peremptory challenges — disparate questioning of blacks — employment of whites by prosecutor — discrimination not shown**

The district attorney's alleged disparate questioning of blacks did not indicate his intent to discriminate in the exercise of his peremptory challenges. Nor was discrimination evident merely because the district attorney's office employs a percentage of whites higher than that of the district itself.

Am Jur 2d, Jury § 235.

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

7. **Jury § 7.9 (NCI3d) — challenge for cause — juror's consideration of impaired capacity mitigating circumstance**

The trial court did not err in the denial of defendant's challenge for cause of a prospective juror on the ground that he would not consider the statutory impaired capacity mitigating circumstance on the basis of alcohol or drugs where it is clear from the juror's answers to voir dire questions that, when instructed by the trial court to consider a statutory mitigating circumstance, he would consider that circumstance but would give it whatever weight he thought appropriate. While defendant is entitled to have the jury consider all appropriate mitigating circumstances, the weight to be given each circumstance is for the individual juror to determine.

**Am Jur 2d, Jury §§ 279, 291.**

8. **Jury § 6.3 (NCI3d) — questioning of prospective jurors — sympathy from observing defendant**

The trial court in a first degree murder case did not abuse its discretion in allowing the district attorney to ask potential jurors whether the fact that they could observe defendant in the courtroom each day would cause them to have sympathy toward defendant and not toward the victim, who obviously could not be present, since the district attorney's questions did not have the effect of urging jurors to ignore defendant's demeanor at trial but sought to identify those jurors who would be sympathetic to defendant due to his presence in the courtroom.

**Am Jur 2d, Jury § 271.**

9. **Jury § 6.3 (NCI3d) — mitigating circumstance of age — illustration to prospective jurors**

The trial court did not abuse its discretion in permitting the district attorney to inform prospective jurors during jury selection that the mitigating circumstance of age might be met if the person was sixteen, seventeen, or eighteen years old since the district attorney merely attempted to illustrate what was meant by the mitigating circumstance of age and did not attempt to "stake out" jurors to a particular test for this mitigating circumstance.

**Am Jur 2d, Jury §§ 265, 267, 269.**

STATE v. SMITH

[328 N.C. 99 (1991)]

**10. Jury § 6.3 (NCI3d) — jury selection — description of mitigating circumstance for murder**

The district attorney did not impermissibly limit the range of mitigating circumstances for first degree murder when he described such circumstances during jury selection as those which "make a murder not so bad."

**Am Jur 2d, Jury §§ 265, 267, 269.**

**11. Jury § 6.3 (NCI3d) — jury selection — fairness to defendant and the people**

The trial court did not abuse its discretion in permitting the district attorney to ask prospective jurors whether they understood that "we must be fair to the defendant and be fair also to the people of North Carolina and the victim's family."

**Am Jur 2d, Jury §§ 265, 267, 269.**

**12. Jury § 6.4 (NCI3d) — jury selection — question about strength to recommend death penalty**

The trial court did not abuse its discretion in permitting the district attorney to ask prospective jurors whether they were "strong enough to recommend the death penalty" since the question was not intended to stake out the jurors but was intended to elicit information that would indicate whether a challenge for cause was warranted.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital cases — post-Witherspoon cases. 39 ALR3d 550.**

**13. Jury § 6.3 (NCI3d) — jury selection — mitigating circumstances — prosecutor's erroneous statement about weight — absence of prejudice**

Defendant was not prejudiced by the district attorney's erroneous statement during jury selection that jurors could give mitigating circumstances no weight at all because the statement related only to the sentencing phase of defendant's trial, and defendant is being awarded a new sentencing proceeding on other grounds.

**Am Jur 2d, Criminal Law § 538; New Trial § 413.**

STATE v. SMITH

[328 N.C. 99 (1991)]

**14. Jury § 6.4 (NCI3d) — jury selection — death penalty views — questioning of prospective jurors**

The trial judge did not deny defendant his right to question prospective jurors about their death penalty views when he sustained the State's objection to defense counsel's question as to whether prospective jurors would recommend a life sentence if defendant was found guilty of first degree murder and the State failed to satisfy them beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances where the trial judge went to great lengths to help defense counsel phrase a question that would be acceptable to the court.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

**15. Jury § 6.3 (NCI3d) — jury selection — more credibility to expert witness**

The trial judge did not abuse his discretion by sustaining objections to questions by defense counsel that reasonably could be perceived as staking out jurors to a position that would have them giving more credibility to an expert witness than to other witnesses.

**Am Jur 2d, Jury § 285.**

**16. Jury § 6.4 (NCI3d) — death penalty views — challenge for cause — refusal to permit rehabilitation**

The trial court did not err in refusing to allow defense counsel to attempt to rehabilitate a venireperson before excusing her for cause based on answers to questions by the prosecutor about her death penalty views where there was no clear indication that the venireperson would have changed her position in response to questioning by defendant.

**Am Jur 2d, Jury §§ 289, 290, 299, 304.**

**17. Jury § 6.4 (NCI3d) — jury selection — Biblical saying — disparate rulings — no absence of judicial impartiality**

The trial court's disparate rulings on objections to similar voir dire questions about a juror's familiarity with the Biblical saying "an eye for an eye" by both defense counsel and the

**STATE v. SMITH**

[328 N.C. 99 (1991)]

district attorney did not reveal an absence of judicial impartiality where defense counsel's question was not immediately relevant to any characteristic of juror competence and so was properly disallowed, and the district attorney's question came in the context of exploring the depth of a juror's religious attitudes about punishment and was properly allowed on the issue of the juror's competence to sit on a death case.

**Am Jur 2d, Jury § 268.**

18. **Jury § 7.9 (NCI3d) — challenges for cause — use of "might" by prospective jurors — different rulings — no abuse of discretion**
    The trial court did not abuse its discretion in denying defendant's challenge for cause of a prospective juror after she responded that drug or alcohol abuse "might" affect her impartiality and in dismissing another juror for cause on its own motion after she stated that the murder of her sister five years earlier "might" influence her decision where the juror challenged by defendant had stated in response to several questions that she would be able to be fair and impartial and could follow the court's instructions, and the second juror never stated that she would be able to ignore her sister's murder in her consideration of the case.

**Am Jur 2d, Jury §§ 279, 291.**

19. **Homicide § 18.1 (NCI3d) — testimony about associate of defendant — competency to show premeditation and deliberation**
    In a prosecution for first degree murder, felonious assault and robbery of two grocery store managers who had come to the store early to prepare a hog for a customer, testimony by the store owner that she saw an associate of defendant in the store talking to a meat department employee the day before the crimes and that she noticed the associate in the store because he was not supposed to be there after he had once threatened to shoot the owner and her husband was relevant to support the State's theory of premeditation and deliberation that defendant had learned from the associate, who had learned from the meat department employee, that the managers would be coming to work early and that he could ambush them when they would be at the store alone.

**Am Jur 2d, Homicide § 275.**

STATE v. SMITH

[328 N.C. 99 (1991)]

20. **Criminal Law § 95 (NCI3d)— religious statements by victim— relevancy to show consciousness**

The trial court did not err in allowing a witness to testify about religious statements made by a murder victim during the ambulance ride to the hospital where the court correctly instructed the jury that this testimony was before it only to show the consciousness of the victim at that time.

**Am Jur 2d, Homicide § 370.**

21. **Criminal Law § 102.5 (NCI3d)— improper questions by prosecutor—objections sustained—absence of prejudice**

Defendant was not prejudiced by the prosecutor's improper questions as to whether a murder victim was able to make peace with the Lord before he died where the trial court properly sustained objections to those questions, and the improper questions were not persistently repeated.

**Am Jur 2d, Trial § 194.**

22. **Criminal Law § 463 (NCI4th)— jury argument—defendant aiming at victim's head—proper inference from evidence**

The district attorney did not commit prosecutorial misconduct amounting to plain error by arguing in both the guilt and sentencing phases of a first degree murder trial that defendant aimed at the victim's head when he shot him a second time during the course of a robbery at a store because a reasonable inference that defendant aimed at the victim's head arose from evidence that defendant shot the victim once from short range in the chest and the victim fell face forward toward an office door; defendant then went with another store employee to a second office where he took money from the cash register tills; defendant then walked back by the office where the victim still lay, crouched down at the office door, and shot the victim again; and the second shot entered the victim's right shoulder and traveled laterally toward the midline of the body.

**Am Jur 2d, Trial § 260.**

23. **Homicide § 25.2 (NCI3d)— premeditation and deliberation— instructions—examples of circumstances—supporting evidence**

Evidence that defendant shot the victim twice from short range in the course of a robbery supported the court's instruction that premeditation and deliberation could be inferred from

STATE v. SMITH

[328 N.C. 99 (1991)]

a brutal and vicious killing or the use of grossly excessive force under the circumstances. Furthermore, evidence that defendant shot the victim a second time while the victim was helpless and unarmed warranted the court's instruction, without proof by the State that the second shot caused the victim's death, that the jury could infer premeditation and deliberation from the infliction of lethal wounds after the victim was felled.

**Am Jur 2d, Homicide §§ 439, 501.**

24. **Criminal Law § 1352 (NCI4th) — death sentence — mitigating circumstances — unanimity requirement — prejudicial error — new sentencing hearing**

The State failed to demonstrate that the trial court's erroneous instruction imposing a unanimity requirement for finding mitigating circumstances in a capital sentencing proceeding was harmless error, and a sentence of death imposed on defendant must be set aside and the case remanded for a new sentencing proceeding, where the trial court submitted nine specific mitigating circumstances and the jury found only one; there was evidence to support at least some of the nine additional mitigating circumstances submitted; and the unanimity requirement may have affected at least one juror's vote on at least some of the nine remaining mitigating circumstances and thus affected the jury's sentencing recommendation.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 553-555.**

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by *Friday, J.,* at the 25 April 1988 Criminal Session of Superior Court, NORTHAMPTON County, upon a jury verdict finding defendant guilty of first-degree murder. This Court allowed defendant's motion to bypass the Court of Appeals on his related assault and armed robbery convictions on 25 August 1989. Heard in the Supreme Court 10 October 1990.

*Lacy H. Thornburg, Attorney General, by Thomas J. Ziko, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. He was also convicted of assault with a deadly weapon with intent to kill inflicting serious injury and two counts of armed robbery. At defendant's capital trial, he was sentenced to death for the murder. The trial court sentenced him to a total of seventy-two years imprisonment on the other offenses. We find no prejudicial error in the suppression, jury selection, or other guilt phases of the trial. The State concedes, and we agree, that defendant is entitled to a new sentencing hearing under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

Mary Davenport and her husband own the B & D Foodland in Ahoskie. In July 1987, Frank Kurczek was the Foodland meat manager and Donnie Carr the store manager. On 25 July 1987, Kurczek and Carr came to work early, about 5:30 a.m., to prepare a hog for a customer. They took the hog out the back door of the store towards the outdoor hog cooker, where they encountered a black male wearing a black ski mask, blue jeans, blue shirt, and having "poppy eyes." The man stood up from behind the cooker with a .22 caliber pistol and said "put your hands up or I'll kill you." The robber patted the two men down, took a key case from Carr, and told them to go to the office where the safe was. Once in the office, the robber repeatedly demanded that they open the safe. Kurczek and Carr answered that they did not know the combination, and Carr said there was money in a cash register in another office. The robber then shot Kurczek in the chest once and went with Carr to the other office. The robber picked up three or four cash register tills and several money bags and told Carr to go to the back of the store. As the robber was leaving the store he went back by the first office, where Kurczek was, turned and squatted and shot him again, and went out the back door with Carr. Kurczek died as a result of the wounds caused by the shots. Once outside, the robber shot Carr three times (in the arm, side and back). The robber then left and Carr called the police. Carr described the robber's race, sex, and clothing to Ms. Davenport shortly after Carr's call to the police, and to policeman Steve Hoggard at the hospital.

Hertford County Deputy Sheriff Chris Williams testified that he was called at 6:00 a.m. on 25 July 1987 to assist in the armed

robbery investigation. The suspect was a black male wearing blue jeans and a blue shirt. At 8:15 a.m., Williams saw a black male walking on the side of the road two miles outside Ahoskie wearing blue jeans and a blue shirt. Williams accelerated his car to catch up with that person and in so doing his car made a loud noise. The person then ran away towards a farmhouse. Other officers came to the area to help look for the unidentified pedestrian.

At 9:20 a.m. Deputy Sheriff Ronnie Stallings saw a black male, who was wearing blue jeans and a blue shirt, running in the vicinity of the farmhouse; the officers present chased, apprehended, and handcuffed the person. The person apprehended was defendant. Stallings testified that he asked defendant what his name was and defendant replied, "why are you messing with me, I haven't shot anybody." Stallings searched defendant and found victim Kurczek's wallet in defendant's pocket. The trial court concluded that Stallings had probable cause to arrest defendant and a reasonable basis for the search and seizure.

Ahoskie policeman Doug Doughtie testified that he advised defendant of his *Miranda* rights at 10:10 a.m. on 25 July 1987. Doughtie and SBI agents Ransome and Wooten then interrogated defendant at the Ahoskie police station from 10:10 a.m. to 1:00 p.m. Defendant was hot, sweaty, and tired after having "hung out" at "The Corner," a noted Ahoskie "hangout" for drug use and drinking. Defendant told the officers he had not slept all night. He said he had not shot or robbed anyone, that he went to the grocery store to get a job, found the wallet on the ground outside the store, and ran when the police came.

After a short break, Sheriff Winfred Hardy, Jr. interrogated defendant at the police station from 1:45 p.m. to 2:05 p.m. Hardy did not repeat the *Miranda* warnings, but did ask if defendant had been read and understood his rights. Hardy then told defendant that he could get the electric chair, that the Bible encouraged truth telling, that defendant's parents would want him to tell the truth, and that it would help with the judge and prosecutor. Hardy testified that defendant agreed to take the police to the local recreation center where they would find a gym bag. Defendant went with the police to the center, but no one found the bag. The police returned defendant to the county jail. Later that afternoon, officers found the gym bag containing binoculars, a rifle scope, a ski mask,

a left-handed glove, a .22 caliber pistol, a baseball cap, and two money bags containing $1,112.97.

Policeman Doughtie, SBI agent Wooten, and another officer interrogated defendant a third time on 25 July 1987 at the Hertford County courthouse from 10:15 p.m. to 11:30 p.m. Defendant received the *Miranda* warnings and agreed to talk. Defendant said he had been drinking the night before and that some of the items found were not his. Doughtie described an incriminating scenario of the day's events to which defendant agreed.

Wooten, Ransome, and Doughtie interrogated defendant again the next day from 7:10 p.m. to 8:10 p.m. They gave him the *Miranda* warnings, and he gave substantially the same response as in the third interrogation.

Defendant was twenty-two years old at the time of trial and had finished the ninth grade. Defendant testified that he awoke at 10:00 a.m. on 24 July, did not have any sleep or food during the thirty hours between awakening and the interrogation on 25 July, and had consumed large amounts of alcohol, marijuana, and crack cocaine during that thirty hours. Dorothea Dix Hospital reports indicate defendant has an "adjustment disorder," poor judgment and insight, an IQ of seventy-nine, "borderline intellectual functioning," and a history of alcohol and cocaine abuse.

SBI agent Michael Creasey testified that defendant's gunshot residue test was negative. Agent Navarro testified that defendant's fingerprints were not on the bank bags, binoculars, rifle scope, gun, or money binders found in the gym bag.

GUILT PHASE

I

[1] Defendant filed motions to suppress evidence derived from his allegedly unlawful and unconstitutional arrest and interrogations. Defendant's first ground for seeking suppression of his confessions and the physical evidence found in the gym bag was that his arrest was without probable cause and was therefore unconstitutional. We have stated that:

A warrantless arrest is based upon probable cause if the facts and circumstances known to the arresting officer warrant a prudent man in believing that a felony has been committed and the person to be arrested is the felon. . . . "Probable

cause for an arrest has been defined to be a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty."

*State v. Zuniga*, 312 N.C. 251, 259, 322 S.E.2d 140, 145 (1984) (citations omitted), *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1984) (quoting *State v. Shore*, 285 N.C. 328, 335, 204 S.E.2d 682, 686 (1974). Defendant contends that the description of "a black male wearing blue jeans and a blue shirt" was insufficient to support a finding of probable cause when an officer saw a person matching the description two hours after the felony occurred and more than two miles from the scene of the felony.

Assuming, without deciding, that the vague description of the felon was insufficient to establish probable cause to arrest, the other circumstances of the arrest, combined with the description, made the arrest lawful. Between 8:00 and 8:30 a.m. Deputy Williams noticed a black man generally fitting the description he received at 6:00 a.m. regarding a robbery and shooting. Williams was in uniform and was driving his patrol car. The man stopped when he noticed Deputy Williams and then ran through a driveway and behind a house as Deputy Williams approached him with the patrol car. Flight may properly be considered in assessing probable cause when it is challenged. *See State v. Zuniga*, 312 N.C. at 263, 322 S.E.2d at 147.

Deputy Williams called for backup to help search the area where the suspect ran. The search ended when the police discovered a black man running through the woods who matched both the early morning description and Deputy Williams' description. Without success, the police called to the man to stop. After a brief chase, the authorities apprehended and patted down the suspect. When Deputy Stallings asked the suspect his name, he responded: "I haven't shot anybody." Deputy Stallings then searched the suspect and discovered a billfold containing a blank check on the account of one of the victims.

In light of all the facts and circumstances surrounding the arrest, we conclude that it was made with probable cause.

[2] Defendant next argues that the trial court should have suppressed the evidence arising out of the interrogation by Sheriff Hardy because the interrogation was conducted without *Miranda*

STATE v. SMITH

[328 N.C. 99 (1991)]

warnings. It is well settled that a confession obtained during custodial police interrogation is inadmissible unless the defendant has first been warned of his constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Here, there is uncontradicted evidence that Ahoskie policeman Doug Doughtie advised defendant of his rights prior to the first interrogation on the morning of 25 July 1987. Defendant nevertheless argues that the warnings given by Officer Doughtie had grown stale and "there is a substantial possibility the [defendant] was unaware of his constitutional rights at the time of the subsequent interrogation . . . ." *State v. McZorn*, 288 N.C. 417, 434, 219 S.E.2d 201, 212 (1975), *death penalty vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976). This Court considers the totality of the circumstances to determine whether the *Miranda* warnings had grown so stale that defendant was unaware of his rights. *Id.; State v. Fisher*, 318 N.C. 512, 522-23, 350 S.E.2d 334, 340 (1986).

Officers first gave defendant warnings at approximately 10:10 a.m. on 25 July 1987, and three officers interrogated him until 1:00 p.m. The evidence tending to indicate that the warnings had grown stale by the time of the second interrogation includes the following: Defendant had not slept for about thirty hours prior to the interrogation and had consumed large amounts of alcohol and drugs in the meantime. Defendant has an IQ of seventy-nine, characterized as borderline intellectual functioning. Sheriff Hardy was not present at the first interrogation and did not restate defendant's *Miranda* rights before questioning him. There were significant differences in defendant's responses to questions in the first interrogation and his responses to Sheriff Hardy's questions in the second interrogation.

There is evidence, however, that the officers offered defendant food and drink before he was interrogated. They conducted the interrogation in an air-conditioned office. Before beginning the first interrogation, the officers asked defendant if he was under the influence of drugs or other stimulants and he responded negatively. The officers explained defendant's rights to him and asked if he would talk to them or if he wanted the services of an attorney. Defendant stated that he would talk to the officers. Each time officers gave the *Miranda* warnings, defendant's answers were recorded on the waiver of rights form; defendant initialled each of his answers and signed the waiver form. Defendant had been advised of his rights on at least four other occasions, and he admitted

that he understood his rights on each of those occasions. The second interrogation followed the first by less than an hour and Sheriff Hardy began the interview by asking defendant if he had been advised of his *Miranda* rights.

Among other findings, the trial court found that the *Miranda* warnings had not become stale by the time Sheriff Hardy interrogated defendant and that when Sheriff Hardy interrogated defendant, he was aware of all his *Miranda* rights and knew he did not have to make a statement if he so chose. These findings are supported by the evidence—particularly the short period of time between interrogations, the familiarity of defendant with the *Miranda* rights, and the comprehensive explanation of defendant's constitutional rights prior to his first interrogation that day—and are therefore binding on this Court. *State v. Johnson*, 322 N.C. 288, 293, 367 S.E.2d 660, 663 (1988); *State v. Williams*, 308 N.C. 47, 60, 301 S.E.2d 335, 344 (1983), *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). The trial court thus did not err in denying suppression of defendant's statements to Sheriff Hardy, or the fruits of those statements, on the basis that the *Miranda* warnings had not grown stale.

[3] Defendant also argues that Sheriff Hardy made improper promises to him in order to induce incriminating statements and that the effect of those promises was to make the confession involuntary. The trial judge found that "no promises or threats were made to the defendant at the time . . . ." "Findings of fact made by the trial judge following a voir dire hearing on the voluntariness of a defendant's confession are conclusive on appeal if supported by competent evidence in the record." *State v. Richardson*, 316 N.C. 594, 598-99, 342 S.E.2d 823, 827 (1986) (quoting *State v. Baker*, 312 N.C. 34, 39, 320 S.E.2d 670, 674 (1984)). Though findings of fact are binding when supported by competent evidence, conclusions of law following from the findings are a proper matter for review. *Id.* at 600-01, 342 S.E.2d at 828; *see also State v. Rook*, 304 N.C. 201, 216, 283 S.E.2d 732, 742 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982); *State v. Fuqua*, 269 N.C. 223, 227, 152 S.E.2d 68, 71 (1967). In reviewing whether the confession was voluntarily given, this Court considers the totality of the circumstances. *State v. Corley*, 310 N.C. 40, 47, 311 S.E.2d 540, 545 (1984).

STATE v. SMITH

[328 N.C. 99 (1991)]

The evidence of the alleged promises by Sheriff Hardy to defendant comes from two sources — defendant's testimony and Sheriff Hardy's testimony. Defendant testified at the suppression hearing that he confessed because "I knew what I did was wrong, and that he [Sheriff Hardy] said that he would talk to the judge, so I, you know, I thought maybe I could get a lighter sentence, you know." Defendant also testified that Sheriff Hardy said "[he] would talk to the judge and try to get [defendant] 20 years," and "out of that [defendant would] do eight or nine."

Sheriff Hardy testified at the suppression hearing: "I told him that the *Bible* speaks — I wanted him to tell the truth. I said, it's in the *Bible*, and if he would tell the truth about it, if the D.A. or the judge would ask me did he tell the truth, I would say yeah." Hardy also testified: "I couldn't tell him what would happened [sic], but it will be better for him when he came to court that he would tell — that we would tell the D.A. and the [judge] that he told the truth about it." On direct examination, however, Sheriff Hardy testified as follows:

Q. All right, did you — at any time did you tell him — did you tell him you couldn't promise him anything?

A. I did.

Hardy also testified as follows:

Q. Did you ever promise him what would happen to him if he told the truth?

A. I did not.

Hardy's testimony on direct examination is competent evidence to support the finding that no promises were made to defendant. Therefore, that finding is binding. *State v. Perdue*, 320 N.C. 51, 59, 357 S.E.2d 345, 350 (1987). The legal conclusion that the confession was given freely and voluntarily, however, is subject to review in light of the totality of the circumstances.

The State's evidence tending to show that the confession was given voluntarily is as follows: The type of "police dominated atmosphere" which can tend to coerce an incriminating statement from a suspect was not present here because the police offered him food and drink and took him to an air-conditioned office. Defendant took no food but accepted Deputy Doughtie's offer of a soft drink. The trial court expressly found as a fact that "at no

time [was] the defendant . . . under any dominating police atmosphere . . . ." Doughtie then advised defendant of his constitutional rights, orally explaining each of the rights to defendant and having defendant initial each right on the waiver of rights form as the right was explained to him. Defendant answered that he understood each of the rights explained to him and responded negatively when asked if he was under the influence of medicine, narcotics, intoxicating liquor, or other stimulant.

At the first interrogation, Doughtie asked defendant if he wanted to speak to the officers, or if he wanted to see an attorney. Defendant stated he would talk to the officers. Doughtie asked defendant if he was freely and voluntarily signing the waiver of rights form. Defendant responded: "Yes."

At the time of his arrest, defendant was in his early twenties. He had completed the ninth grade and had received an electrician's certificate after attending Roanoke-Chowan Tech for a year. Defendant was able to read the waiver of rights form and could understand what it said. In addition, prior to this arrest defendant had been advised of his rights on four occasions. Defendant admitted he understood the rights when explained to him on the earlier occasions and on the date of this arrest.

Officers gave defendant his *Miranda* warnings at approximately 10:00 a.m. and interrogated him until sometime after 1:00 p.m. During defendant's first interrogation, he admitted that he was at the crime scene earlier that morning and saw a man lying on the floor in a pool of blood. Defendant said he found the confiscated wallet near the garage part of the store and fled when the police arrived at the scene. Defendant denied robbing or shooting either victim.

Deputy Doughtie testified that during the interview defendant was alert and did not appear to be under the influence of any intoxicants. Defendant was tired but did not appear sleepy.

Shortly thereafter, Sheriff Hardy began his interrogation. Sheriff Hardy testified that he began his interview with defendant by asking if defendant had been advised of his constitutional rights. Sheriff Hardy also asked if defendant understood those rights. Defendant responded affirmatively to both questions.

In light of all the circumstances related to defendant's confession and the trial court's findings of fact, which were supported

by competent evidence, we uphold the conclusion that "the defendant freely and voluntarily told the Sheriff about the location of the nylon bag in question at the recreation department." There was "plenary competent evidence" to support the conclusion that the confession was voluntary. *State v. Corley,* 310 N.C. at 52, 311 S.E.2d at 547.

Defendant's reliance on *State v. Fox,* 274 N.C. 277, 163 S.E.2d 492 (1968) is misplaced. In *Fox* we found the admission of a confession to be prejudicial error where an officer told the suspect it would be better for him in court if he told the truth. *Id.* at 292, 163 S.E.2d at 503. In *Fox,* however, the trial court found as a fact that the promise at issue had been made, yet concluded as a matter of law that the confession was voluntary. In the case at bar, the trial court found that the officers made no promises, and competent evidence supports that finding. Thus, this case is not controlled by *Fox.*

Defendant also seeks to rely on *State v. Fuqua,* 269 N.C. 223, 152 S.E.2d 68. In *Fuqua,* however, the Court ordered a new trial because there were no facts to support the trial court's finding that the confession was not made under the hope of reward. *Id.* at 227-28, 152 S.E.2d at 71. Absent any conflict in the testimony, the Court concluded that the "total circumstances surrounding the defendant's confession impels [sic] the conclusion that there was aroused in him an 'emotion of hope' so as to render the confession involuntary." *Id.* at 228, 152 S.E.2d at 72. In this case, however, Sheriff Hardy denied making any promises to defendant, thereby supporting the trial court's finding of "no promises." In addition, as stated above, the totality of the circumstances permits the conclusion that the confession here was given voluntarily.

In *State v. Pruitt,* 286 N.C. 442, 212 S.E.2d 92 (1975), this Court ordered a new trial where an officer testified that he told a suspect "it would simply be harder on him if he didn't go ahead and cooperate." 286 N.C. at 452, 212 S.E.2d at 99. The trial court had found that no inducements were made and that the confession was made knowingly and voluntarily. This Court considered the entire record and concluded that "the interrogation of defendant by three police officers took place in a police-dominated atmosphere" and that "one can infer that the language used by the officers tended to provoke fright." *State v. Pruitt,* 286 N.C. at 458, 212 S.E.2d at 102. The Court stated: "We are satisfied that both the

oral and written confessions obtained from defendant were made under the influence of fear or hope, or both, growing out of the language and acts of those who held him in custody." *Id.*, 212 S.E.2d at 102-03. Here, the trial court found that defendant was not in a police-dominated atmosphere, and there is no evidence that defendant was afraid. Defendant had significant experience with the criminal justice system, and it appears that the officers did little if anything to instill fear into him.

This case is more like *State v. Richardson*, 316 N.C. 594, 342 S.E.2d 823. In *Richardson* defendant's confession came as a result of bargaining with police officers. Thus, the promises made did not render his confession involuntary because "[p]romises or other statements indicating to an accused that he will receive some benefit if he confesses do not render his confession involuntary when made in response to a solicitation by the accused." *Id.* at 604, 342 S.E.2d at 831. In the present case, defendant testified that Sheriff Hardy asked where the "gun and stuff was at." Defendant asked why he should tell, and Sheriff Hardy responded that defendant could get the electric chair. Thus, according to defendant's own testimony, any benefits that Sheriff Hardy mentioned were in response to defendant's own inquiry.

For the reasons stated, we conclude that the trial court did not err in holding that defendant's confession was given freely and voluntarily.

[4]   Defendant also contends he is entitled to a new suppression hearing because the trial court's findings were inadequate to resolve material issues of fact regarding the voluntariness of his confession. It is well settled that "[i]n determining whether a confession is voluntary it is the trial judge's duty to make findings of fact resolving all material conflicts in the evidence as to what the defendant and the investigating officers said and did during the relevant time period preceding the defendant's confession." *Id.* at 600, 342 S.E.2d at 828.

Defendant argues that there is a material conflict as to whether, and what kind of, promises were made to him in order to acquire his confession. Thus, defendant argues that the trial court should have made specific findings regarding what promises and statements were made. Further, defendant asserts that the actual finding made by the trial court that "no promises or threats were made to the defendant at the time . . . that on the contrary the defendant

freely and voluntarily [confessed]" was actually a conclusion of law as to the voluntariness of the confession and not a finding of fact regarding promises.

As stated above, the trial court must make findings of fact to resolve *material conflicts in the evidence*. We note, however, that Sheriff Hardy gave uncontradicted testimony that he told defendant he could tell the judge and district attorney that defendant had cooperated. Because such testimony was uncontradicted, there was no need for the trial court to make findings regarding that statement. Further, we concluded above that such a statement on the part of the Sheriff did not, in light of all the circumstances, make the confession involuntary.

There was a material conflict in the evidence, however, in that Sheriff Hardy denied making the statements or promises about which *defendant* testified. In finding that no promises were made to defendant, the court necessarily made the credibility resolution in favor of the Sheriff's denials. Thus, the court found, in essence, that the promises about which defendant testified were never made. This finding supported the conclusion, immediately following, that the confession was freely and voluntarily given.

For the foregoing reasons, defendant is not entitled to relief on this assignment of error.

## II

[5] Defendant contends he is entitled to a new trial because the district attorney violated his state and federal constitutional rights by peremptorily challenging prospective jurors solely on the basis of race. Article I, section 26 of the Constitution of North Carolina prohibits such use of peremptory challenges. *State v. Crandell*, 322 N.C. 487, 501, 369 S.E.2d 579, 587 (1988). In addition, the equal protection clause of the Fourteenth Amendment of the United States Constitution prohibits such discrimination. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). *Batson* held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89, 90 L. Ed. 2d at 83.

In *Batson* the Supreme Court established a three-part test for determining whether a defendant has established a prima facie case of purposeful discrimination:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group, . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at 96, 90 L. Ed. 2d at 87-88 (citations omitted). If defendant is able to make his prima facie case, the State must rebut with a "clear and reasonably specific" explanation revealing that each peremptory challenge was not based solely on race. *Id.* at 98 n.20, 90 L. Ed. 2d at 88 n.20 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 67 L. Ed. 2d 207, 218 (1981)). Defendant "has a right of surrebuttal to show that the prosecutor's explanations are a pretext." *State v. Porter*, 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990).

There is no dispute that defendant is black and that the district attorney peremptorily challenged blacks in the venire. The question, then, is whether defendant "rais[ed] an inference" of purposeful discrimination and thus established a prima facie case of discrimination.

Since *Batson* was decided, this Court has described several of the factors relevant to the examination of a defendant's prima facie case of discriminatory use of peremptory challenges. *Batson* itself noted that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate,'" *Batson v. Kentucky*, 476 U.S. at 96, 90 L. Ed. 2d at 87, and that "these facts and any other relevant circumstances" are to be considered to determine if defendant has raised an inference of discrimination. *Id.*, 90 L. Ed. 2d at 87-88. Among the relevant circumstances are "[t]he race of the defendant, the victims, and the key witnesses." *State v. Porter*, 326 N.C. at 498, 391 S.E.2d at 150-51; *see also State v. Crandell*, 322 N.C. at 502, 369 S.E.2d at 588; *State v. Robbins*, 319 N.C. 465,. 491, 356 S.E.2d 279, 296, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987). We have also

considered "questions and statements made by the prosecutor during voir dire examination and in exercising his peremptories which may either lend support to or refute an inference of discrimination." *State v. Robbins*, 319 N.C. at 489, 356 S.E.2d at 293; *see also State v. Jackson*, 322 N.C. 251, 255, 368 S.E.2d 838, 840 (1988). One of the most important considerations is whether there is "repeated use of peremptory challenges to blacks which would tend to establish a 'pattern' of strikes against blacks in the venire," *State v. Robbins*, 319 N.C. at 490, 356 S.E.2d at 294, or "*the prosecution's use of a disproportionate number of peremptory challenges to strike black jurors in a single case . . . .*" *Id.* at 490-91, 356 S.E.2d at 294 (emphasis added). We have concluded that the discrimination in a case need not be pervasive, as "[e]ven a single act of invidious discrimination may form the basis for an equal protection violation." *Id.* at 491, 356 S.E.2d at 295.

On the other hand, one factor tending to refute an allegation of discriminatory use of peremptories is the acceptance rate of black jurors by the State. The frequency with which a district attorney accepts black jurors is relevant to the issue of whether he is discriminating against blacks. *See State v. Allen*, 323 N.C. 208, 219, 372 S.E.2d 855, 862 (1988) (minority acceptance rate of 41% failed to establish prima facie case of discrimination); *State v. Abbott*, 320 N.C. 475, 481-82, 358 S.E.2d 365, 369 (1987) (acceptance rate of 40% fails to establish prima facie case); *State v. Belton*, 318 N.C. 141, 159-60, 347 S.E.2d 755, 766 (1986) (acceptance rate of 50% fails to establish prima facie case).

Thus, the acceptance rate of minorities by the State is relevant to our inquiry, but it is not dispositive. When a district attorney uses all his peremptories, discriminatorily or not, he will be forced to accept replacement jurors regardless of their race. Under such facts the acceptance rate would have little to do with the district attorney's actual intent to discriminate. Further, the presence of an intent to discriminate may be proved by a number of factors or circumstances, not just the acceptance rate of black jurors. Absent such circumstances, however, the acceptance rate of blacks might well be the best evidence of an intent to discriminate *vel non. See, e.g., State v. Allen*, 323 N.C. 208, 372 S.E.2d 855; *State v. Abbott*, 320 N.C. 475, 358 S.E.2d 365; *State v. Belton*, 318 N.C. 141, 347 S.E.2d 755. In that light, the district attorney's acceptance of nine out of twenty-one black prospective jurors (42.8%) is some evidence that there was no discriminatory intent. There are, however,

other factors that tend to indicate that defendant was able to raise an *"inference* of purposeful discrimination."

First, this case involved an interracial killing and attracted much attention. The defendant is a young black man and both victims were white. The racial emotions and publicity surrounding the case were substantial enough for defendant successfully to seek a change of venue from Hertford County to Northampton County. It is apparent that race-consciousness by both parties played a role throughout jury selection. As the district attorney explained to the trial court:

> Your Honor, I'd like to get something in the record, if I may.
>
> . . . .
>
> We'd also like for the record to reflect, Judge, that the counsel for the defendant excused two white jurors, who were there, and that the record is now, as I understand it, was— there are now six black jurors who are seated on the jury and there are only three white jurors who are seated on the jury, and I'd just like the record to reflect that—that the counsel for the defendant with the exception of I believe, only one, has excused all white jurors from the jury panel.
>
> . . . [B]ut I submit to the Court that the State, the victim in this case is also entitled to a fair representation of those jurors who are seated there. The victim is white, they ought to have a fair representation as to the number of black/white jurors that are on there, and at the rate that we're going, we'll have—if it's any wish apparently of the defendant, we'll have nine—nine/three or worse.
>
> . . . [B]ut since counsel has raised the State being discriminatory as far as what it's doing, we would also submit to the Court that the defendant is discriminating against white jurors so that the defendant himself who is in a majority county with mostly black people will have mostly black people on the jury or more or all black people as he can have, and the white person who is in the minority in Northampton County will have no—will have as little as—little as they can possibly get.

This statement should be read in its proper context—that of criticizing defense counsel for using fifteen out of sixteen peremp-

tory challenges to excuse white jurors. As our cases have held, however, such "questions and statements made by the prosecutor during voir dire examination and in exercising his peremptories . . . may either lend support to or refute an inference of discrimination." *State v. Robbins*, 319 N.C. at 489, 356 S.E.2d at 293; *State v. Jackson*, 322 N.C. at 255, 368 S.E.2d at 840. The statement described above tends to support, rather than refute, an inference of discrimination.

Another factor that distinguishes this case from the earlier line of cases emphasizing acceptance rates is the pattern of discrimination revealed by the use of peremptories. Here, the State used its first three peremptories, and six of its first seven, to remove blacks. Though the district attorney did not use all sixteen of his peremptories, he did use twelve out of fifteen to exclude blacks. Thus, the State exercised 80% of the peremptories used to remove black potential jurors in a case involving an interracial killing with highly charged racial emotions. The fact that the district attorney exercised a high percentage of peremptories to remove blacks corroborates the inference of discrimination arising from his statement described above.

In light of all the relevant circumstances, we conclude that defendant successfully raised "an inference of discrimination" and thus established a prima facie case of discriminatory use of peremptories.

[6] We note that defendant also seeks to support his case for discrimination by arguing that the district attorney's biased and disparate questioning of blacks indicated his intent to discriminate. We have stated, however, that

> alleged disparate treatment of prospective jurors would not be dispositive necessarily. Choosing jurors, more art than science, involves a complex weighing of factors. Rarely will a single factor control the decision-making process. Defendant's approach in this appeal involves finding a single factor among the several articulated by the prosecutor as to each challenged prospective juror and matching it to a passed juror who exhibited that same factor. This approach fails to address the factors as a totality which when considered together provide an image of a juror considered in the case undesirable by the State. We have previously rejected this approach.

*State v. Porter*, 326 N.C. at 501, 391 S.E.2d at 152-53. Likewise, we reject the argument made by defendant that discrimination is evident merely because the district attorney's office employs a percentage of whites higher than that of the district itself.

[5]   Having concluded that defendant has raised an inference of discrimination, we must determine whether his prima facie case was rebutted. The State must rebut with a " 'clear and reasonably specific' explanation 'related to the particular case to be tried.' " *State v. Porter*, 326 N.C. at 497, 391 S.E.2d at 150 (quoting *Batson v. Kentucky*, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20). This explanation need not rise to the level required to justify exercising a challenge for cause. *Id.* at 498, 391 S.E.2d at 151. In considering the State's rebuttal, a reviewing court should remember that "the trial judge's findings 'largely will turn on evaluation of credibility, [and so] should give those findings great deference.' " *Id.*, 391 S.E.2d at 150. As quoted above, jury selection is "more art than science," *id.* at 501, 391 S.E.2d at 152, and "[s]o long as the motive does not appear to be racial discrimination, the prosecutor may exercise peremptory challenges on the basis of 'legitimate "hunches" and past experience.' " *Id.* at 498, 391 S.E.2d at 151 (quoting *State v. Antwine*, 743 S.W.2d 51, 65 (Mo. 1987) (en banc), *cert. denied*, 486 U.S. 1017, 100 L. Ed. 2d 217 (1988) ).

We have held that it is permissible for the district attorney to explain to the court prior to jury selection that he "wanted a jury that was 'stable, conservative, mature, government oriented, sympathetic to the plight of the victim, and sympathetic to law enforcement crime solving problems and pressures.' " *State v. Jackson*, 322 N.C. at 257, 368 S.E.2d at 841. We have also held that the ultimate racial makeup of the jury is relevant but not dispositive. *See State v. Porter*, 326 N.C. at 500, 391 S.E.2d at 152; *State v. Abbott*, 320 N.C. at 481-82, 358 S.E.2d at 369-70; *State v. Allen*, 323 N.C. at 219, 372 S.E.2d at 862. Finally, as noted above, we have held that the State may rebut a charge of discrimination with evidence that the State accepted black jurors, that the State did not use all of its peremptory challenges, or that the early pattern of strikes does not indicate discriminatory intent. *See State v. Jackson*, 322 N.C. at 255, 368 S.E.2d at 840; *State v. Robbins*, 319 N.C. at 492-93, 356 S.E.2d at 294-95; *State v. Davis*, 325 N.C. 607, 620, 386 S.E.2d 418, 424 (1989), *cert. denied*, --- U.S. ---, 110 L. Ed. 2d 268 (1990).

**STATE v. SMITH**

[328 N.C. 99 (1991)]

Here, the trial court concluded that "the State has assigned substantial reasons in each and every instance for its exercise of . . . peremptory challenges and the Court finds no evidence of purposeful discrimination by the State." We note that the State did not use all its peremptories, that it accepted nine blacks, and that the jury ultimately was composed of seven blacks and five whites.

An examination of the actual explanations given by the district attorney for challenging black veniremen is a crucial part of testing defendant's *Batson* claim. The record reveals that the district attorney explained to prospective juror Barkley that "I think perhaps just because you're a little bit younger perhaps than some of the other jurors, I'm going to excuse you in this particular instance." Barkley was twenty-one and defendant was twenty-two at the time of trial. The district attorney also exercised peremptories to excuse prospective jurors Vick, Tann, Harris, and Daye because they each had sons approximately the age of defendant. In *State v. Davis* we considered such an explanation in rebuttal and concluded there was no discrimination. *Davis*, 325 N.C. at 619, 386 S.E.2d at 423 (age of juror and his children, as compared to defendant's age, proper evidence for rebuttal).

The district attorney explained that he excused prospective juror Reid because of Reid's earlier association with defense counsel. The district attorney excused prospective juror Sykes because he felt, based on information he had gathered previously, that Sykes gave misleading answers to voir dire questions. Prospective juror Seabrun was excused because the State's victim-witness coordinator had testified that she thought Seabrun had a nephew in trouble with drugs.

In excusing prospective juror Benjamin, the district attorney noted Benjamin's nervousness during questions about the death penalty. Prospective juror Brown was challenged peremptorily because his initial death penalty answers were uncertain. Likewise, the district attorney challenged prospective jurors Boone and Edwards because they appeared nervous at certain times during voir dire. Though the district attorney's other stated reason for excusing Brown and Boone—that they were unmarried parents— does not appear relevant to the case, jury selection is often driven by inferences about a juror's ability to be fair based upon counsel's observation of the juror's behavior during voir dire. *See, e.g., State*

STATE v. SMITH

[328 N.C. 99 (1991)]

*v. Porter*, 326 N.C. at 500, 391 S.E.2d at 152. Thus, a prospective juror's nervousness or uncertainty in response to counsel's questions may be a proper basis for a peremptory challenge, absent defendant's showing that the reason given by the State is pretextual.

At this stage in the analysis we conclude that while defendant established a prima facie case of discriminatory use of peremptory challenges, the State rebutted defendant's evidence with neutral explanations for each peremptory strike. The last step is to examine defendant's argument on surrebuttal that the State's explanations are pretextual.

*Porter* describes the framework for this analysis:

Several courts have identified factors to which the judge should refer in assessing whether these articulated reasons are legitimate or a pretext. First, the judge should consider "the susceptibility of the particular case to racial discrimination." . . . Second, the judge should consider the prosecutor's demeanor to determine whether the prosecutor is "engaging in a careful process of deliberation based on many factors." . . . Third, the court should " 'evaluate the explanation itself.' " . . .

Evaluation of the prosecutor's explanation involves reference to objective and subjective criteria. . . . The trial judge should consider whether "similarly situated white veniremen escaped the State's challenges" and "the relevance of the State's justification" to the case at trial. . . .

The trial judge should evaluate the explanation "in light of the explanations offered for the prosecutor's other peremptory strikes" and "the strength of the prima facie case." . . . In assessing the "entire milieu of the voir dire," the judge must "compar[e] his observations and assessments of veniremen with those explained by the State," guided by his personal experiences with voir dire, trial tactics and the prosecutor and by any surrebuttal evidence offered by the defendant.

*Id.* at 498-99, 391 S.E.2d at 150-51 (citations omitted).

We hold that the record supports the trial court's conclusion that the reasons given by the district attorney were not pretextual. It permits a conclusion that the district attorney was primarily concerned with removing jurors who might not be able to give

defendant and the State a fair trial. These concerns arose due to prospective jurors' uncertainties about the death penalty, nervousness in the face of voir dire questioning, prior contact with either defense counsel or the criminal justice system, and having children approximately the age of defendant. The ability of the trial judge to observe firsthand the reactions, hesitations, emotions, candor, and honesty of the lawyers and veniremen during voir dire questioning is crucial to the ultimate determination whether the district attorney has discriminated. Because there is ample evidence to support the trial judge's conclusion that there was no racial discrimination by the State in this case, we overrule this assignment of error.

[7] Defendant next assigns as error the trial court's denial of defendant's challenge for cause of potential juror Williford. Defendant contends the record shows that Williford could not follow North Carolina law in that he would not consider the statutory mitigating circumstance set forth in N.C.G.S. § 15A-2000(f)(6) — whether "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." In questioning Williford, defense counsel referred to alcohol and drug use as a potential basis for the impaired capacity mitigation contemplated by section 2000(f)(6). *See State v. Irwin,* 304 N.C. 93, 106, 282 S.E.2d 439, 448 (1981). In response to the question whether he could consider impaired capacity due to intoxication by drugs or alcohol as a mitigating circumstance, Williford stated: "I think not." It is clear from the context of the questioning, however, that Williford understood the question to be whether the mere influence of drugs or alcohol would constitute a mitigating circumstance.

In seeking to clarify, defense counsel asked again whether Williford would consider impaired capacity as a mitigating circumstance if defendant proved that circumstance by a preponderance of the evidence. Williford again responded: "Not alcohol or drugs, no." The trial court finally resolved the confusion by asking Williford "[e]ven though the Court instructed you in that manner, you could not consider it, give the evidence such weight as you believe it to be due?" Williford responded: "I would weigh it, Your Honor, but it would carry little weight, I'm afraid. I don't consider that a mitigating circumstance, but I would weigh it." In addition, defense counsel later asked Williford "will your feelings about drugs prevent you from considering the evidence that may [be] presented

at the sentencing hearing . . . ?" Williford responded, "I think not." Thus, it is clear that Williford, when instructed by the trial court to consider a statutory mitigating circumstance, would consider that circumstance, but would give it whatever weight he thought appropriate. Defendant is entitled to have the jury consider all appropriate mitigating circumstances, but the weight to be given each circumstance is for the individual juror to determine. *See State v. Craig and State v. Anthony*, 308 N.C. 446, 460, 302 S.E.2d 740, 749, *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983); *State v. Kirkley*, 308 N.C. 196, 220, 302 S.E.2d 144, 158 (1983), *overruled on other grounds, State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). Accordingly, the trial court did not err in denying the challenge to potential juror Williford.

Defendant next argues he is entitled to a new trial because of the district attorney's improper statements and questions during jury selection. The trial judge has broad discretion in the regulation of the jury voir dire. *State v. Lee*, 292 N.C. 617, 621, 234 S.E.2d 574, 577 (1977). To prevail on this assignment of error, defendant must show a clear abuse of discretion and prejudice from the trial court's rulings. *State v. Avery*, 315 N.C. 1, 20, 337 S.E.2d 786, 797 (1985).

[8]   Over defendant's objection, the trial court allowed the district attorney to ask potential jurors whether the fact that they could observe defendant in the courtroom each day would cause them to have sympathy towards defendant and not towards the victim, who obviously would not be present. Defendant argues that this question was prejudicial because it involved an incorrect statement of the law. Under North Carolina law, jurors may consider as evidence what they observe about defendant in the courtroom. *State v. Brown*, 320 N.C. 179, 199, 358 S.E.2d 1, 15, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). Thus, defendant argues that the questions tended to suggest that the jury could not consider whatever sympathy they felt for the defendant based on their observations of him at trial.

The questions, however, had a narrower focus. The purpose was to discover whether prospective jurors would have sympathy for the defendant based on his mere presence in the courtroom. Such sympathy might be based on "emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase." *California v. Brown*, 479 U.S. 538, 542,

STATE v. SMITH

[328 N.C. 99 (1991)]

93 L. Ed. 2d 934, 940 (1987). The crucial point is that the district attorney's questions did not have the effect of urging the jurors to ignore the defendant's demeanor at trial; rather, the questions sought to identify those jurors who would be sympathetic to defendant due to his presence in the courtroom. The trial judge did not abuse his discretion by allowing such questions.

[9] Defendant also argues that the district attorney misled potential jurors by informing them during jury selection that the mitigating circumstance of age might be met if the person was sixteen, seventeen, or eighteen years old. Defendant was twenty-two at the time of trial. While there is no "hard and fast rule" to follow in determining if the mitigating circumstance of age is met, "the chronological age of a defendant is not . . . determinative." *State v. Oliver*, 309 N.C. 326, 372, 307 S.E.2d 304, 333 (1983). The statement made by the district attorney was accurate and did not violate the principles enunciated in *Oliver*. The district attorney attempted to illustrate what was meant by the mitigating circumstance of age, and it did not serve to "stake out" jurors to a particular test for this mitigating circumstance. The trial judge did not abuse his discretion by allowing this.

[10] Defendant contends the district attorney impermissibly limited the range of mitigating circumstances when he described such circumstances as those which "make a murder not so bad." The proper description of a mitigating circumstance is a fact "which may be considered as extenuating, or reducing the moral culpability of killing or making it less deserving of the extreme punishment than other first-degree murders." *State v. Boyd*, 311 N.C. 408, 421, 319 S.E.2d 189, 198 (1984), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985) (quoting *State v. Brown*, 306 N.C. 151, 178, 293 S.E.2d 569, 586 (1982)). The district attorney's description of mitigating circumstances was not so dissimilar from the full description that we can find an abuse of discretion by the trial court, especially in light of the fact that the court ultimately gave a proper instruction.

[11] On several occasions, the district attorney asked, over objection, "do you understand that . . . we must be fair to the defendant and be fair also to the people of North Carolina and the victim's family?" "Both the defendant and the State are entitled to a fair and unbiased jury," and "the primary purpose of the *voir dire* of prospective jurors is to select an impartial jury." *State v. Lee*, 292 N.C. 617, 621, 234 S.E.2d 574, 577 (1977). The primary thrust

of the question was to call the jury's attention to this right of both sides to a fair, unbiased, impartial jury, and we find no abuse of discretion in allowing it.

[12] Defendant also argues that when the district attorney asked potential jurors whether they were "strong enough to recommend the death penalty," he effectively staked them out to a position in which they felt obligated to return a sentence of death once they arrived at the sentencing stage. We have held, however, that a prosecutor's query as to whether a potential juror has the "backbone" to impose the death penalty does not constitute prejudicial error. *See State v. Hinson*, 310 N.C. 245, 252, 311 S.E.2d 256, 261, *cert. denied*, 469 U.S. 839, 83 L. Ed. 2d 78 (1984). In addition, N.C.G.S. § 15A-1212(8) allows counsel to challenge for cause a juror who "as a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." The question was intended to elicit information that would indicate whether a challenge for cause was warranted. We find no abuse of discretion in allowing it.

[13] Finally, defendant argues that the district attorney erroneously was allowed to state that jurors could give mitigating circumstances no weight at all. We have previously stated that if a jury finds a mitigating circumstance to exist, it must "consider that mitigating circumstance in its final sentence determination." *State v. Kirkley*, 308 N.C. at 220, 302 S.E.2d at 158. We have also stated that once the jury finds the existence of a statutory mitigating circumstance, it "cannot determine that it does not have mitigating value." *State v. Fullwood*, 323 N.C. 371, 396, 373 S.E.2d 518, 533 (1988), *death sentence vacated*, --- U.S. ---, 108 L. Ed. 2d 602 (1990). The district attorney's statement thus was inconsistent with our law. Because the statement related only to the sentencing phase of defendant's trial, however, and because defendant is being awarded a new sentencing proceeding on other grounds, he has not shown prejudice from this statement that merits a new guilt phase trial.

[14] Defendant's next assignment of error concerns objections by the district attorney, sustained by the trial court, that allegedly denied defendant the opportunity to question potential jurors regarding their ability to follow the capital sentencing law and to follow the judge's instructions regarding expert testimony. On several occasions defendant sought to ask potential jurors questions such

as the following: "If the defendant is found guilty of first degree murder and . . . the State has failed to satisfy you beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, would you recommend a life sentence?" Even if such questions were not impermissible attempts to "stake out" jurors, defendant has shown no abuse of discretion or prejudicial error in light of the fact that the trial judge went to great lengths to help defense counsel phrase a question that would be acceptable to the court. Defense counsel was allowed to ask: "[I]f after hearing the evidence and the law and if Mr. Smith was convicted of first degree murder, and if you were satisfied the State had not proven beyond a reasonable doubt that the death sentence should be imposed, could you recommend a life sentence?" We thus cannot conclude that the trial court denied defendant his right to question prospective jurors about their views on the death penalty. *See, e.g., State v. Adcock,* 310 N.C. 1, 10, 310 S.E.2d 587, 593 (1984).

[15]   In addition, the trial judge did not abuse his discretion by sustaining objections to questions by defense counsel that reasonably could be perceived as staking out jurors to a position that would have them giving more credibility to an expert witness than to other witnesses. Defendant's question—"If someone is offered as an expert in a particular field such as psychiatry, could you accept him as a[n] expert, his testimony as an expert in that particular field?"—is not *per se* an attempt to stake out jurors. However, because the question followed a reference to the district attorney's earlier statements about not giving more credence to a witness just because the witness might be labelled an expert, the trial judge reasonably could have interpreted defendant's question as an attempt to stake out potential jurors. This assignment of error is without merit.

[16]   Defendant assigns as error the trial court's refusal to allow defense counsel to rehabilitate venireperson Hardy before excusing her for cause on the grounds that the "juror's views would prevent or substantially impair the performance of [her] duties as a juror in accordance with [the] instructions and [the juror's] oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 65 L. Ed. 2d 581 (1980)). Hardy was excused after the following exchange:

[Q.] [C]ould you yourself recommend the death penalty knowing that the Court would follow your recommendation?

[A.] I don't really know, I don't think I would.

[Q.] You don't think you would do what?

[A.] Take someone's life, no.

[Q.] Okay, are there any circumstances under which you yourself . . . could recommend to the Court the death penalty knowing the Court would be bound to follow your recommendation?

[A.] No.

[Q.] [Regardless] of what you may hear from the witness stand and what His Honor may tell you the law is in the case, there are no circumstances under which you yourself could recommend the death penalty?

Is that a fair statement?

[A.] Yes.

It is not disputed that such answers constitute grounds for challenge for cause. Defendant argues, however, that he is entitled to relief because the trial court did not allow rehabilitation. The trial court is entitled to great deference upon review of the dismissal of a juror for cause. In addition, we have held that the trial court does not abuse its discretion when it refuses to allow attempted rehabilitation of a juror absent a showing by defendant that different answers might have been forthcoming. *See State v. Oliver,* 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981). Defendant contends that Hardy's initial responses to death penalty questions constituted the necessary showing. She did answer that in "some cases" the death penalty would be an appropriate punishment, and she did not have any personal or religious feelings against the death penalty. These statements, however, appear uncertain and ambiguous in light of her more definite, specific, and adamant responses which formed the basis for her excusal for cause. There is no clear indication that she would have changed her position in response to questioning by defendant; therefore, the trial court did not abuse its discretion in denying defendant's request to rehabilitate her.

Defendant's last assignment of error in the jury selection phase concerns the alleged absence of impartiality on the part of the trial judge. Without doubt, the trial judge has a "duty of absolute

impartiality." *State v. Frazier*, 278 N.C. 458, 460, 180 S.E.2d 128, 130 (1971).

[17] Defendant's first grounds for alleging absence of impartiality is disparate rulings on objections to similar voir dire questions by both defense counsel and the district attorney. At one point in voir dire defense counsel asked several jurors if they belonged to a church and if they held office in a church. Then, defense counsel asked juror Lanier if he had "heard of the Biblical saying 'an eye for an eye?' " The district attorney's objection to the question was sustained on grounds that the question did not relate to qualifying the jury. Shortly thereafter, the district attorney engaged juror Duke in the following exchange:

[Q.] Do you have any personal or religious feelings against the use of the death penalty?

[A.] Yes, I do, religious belief, I would hate to vote for it.

. . .

[Q.] How would you characterize your feelings?

[A.] Well, just like I tell my kids, the only thing I know that's in the *Bible*, I don't know.

[Q.] Of course, you understand there are other things that the *Bible* says?

[A.] Yes.

[Q.] A life for a life, an eye for an eye.

At this point, defense counsel's objection was overruled. Although it may appear that the district attorney received favorable treatment from the trial judge in that he was allowed to ask about a juror's familiarity with Biblical retribution, the context reveals the contrary. Defense counsel's question about the Biblical saying was not immediately relevant to any characteristic of juror competence and so was properly disallowed. The district attorney's question, however, came in the context of exploring the depth of a juror's religious attitudes about punishment, a matter clearly relevant to the juror's competence to sit on a death case. The trial judge's rulings in this regard did not reveal an absence of judicial impartiality.

**STATE v. SMITH**

[328 N.C. 99 (1991)]

[18]    Defendant also objects to the trial judge's allegedly disparate rulings on similar challenges for cause. Defense counsel challenged juror Ricks for cause after she responded that drug or alcohol use "might" affect her impartiality, that she "would try" to be fair and impartial, though she could not "answer yes or no" and stated "I can't promise." The trial court denied defendant's challenge for cause. The trial court, however, on its own motion challenged juror Harris for cause after she stated that the murder of her sister five years before "might" influence her decision; Harris stated: "I ain't going to say it [will] and I ain't going to say it won't . . . ."

One significant factor serves to distinguish the challenges to the two jurors. Before being challenged for cause, Ms. Ricks had stated in response to several questions that she would be able to be fair and impartial and that she would follow the trial court's instructions. Juror Harris, on the other hand, never stated that she would be able to ignore her sister's murder in her consideration of the case. The decision to grant or deny a challenge for cause lies in the sound discretion of the trial court. *State v. Kennedy,* 320 N.C. 20, 28, 357 S.E.2d 359, 364 (1987). In light of the foregoing distinction, we find no abuse of discretion in this ruling.

Defendant also argues that the trial court was much more lenient with the district attorney's death penalty questioning than with defendant's. Defendant contends that impossible burdens were put on the phrasing of defendant's questions so as to disrupt the flow and direction of the voir dire. In addition, defendant contends that the court adopted a prosecutorial role by "helping" defendant rephrase his questions in a manner completely different from what defendant intended.

We have reviewed the restrictions on defendant's death penalty questioning above and found no abuse of discretion. Further, our examination of the record reveals that the voir dire questioning was a confusing, sporadic event that tested everyone's patience. It is evident that the trial judge attempted to help defense counsel phrase his questions in an appropriate manner so as to assure a qualified jury. We conclude that the trial court's actions did not communicate absence of impartiality to the jury. *Cf. State v. Staley,* 292 N.C. 160, 232 S.E.2d 680 (1977) (clear inference of judge's opinion regarding witness's truthfulness). Further, there is no evidence that the trial court's actions deprived defendant

of his right to effective assistance of counsel. This assignment is without merit.

III

[19]   At trial, Mary Davenport testified to the effect that she owned the store that was robbed, that a person named Freddie Tann once worked for her, that Tann was in the store talking to Grantson Taylor the day before the robbery, that both Tann and Taylor were associates of defendant, and that Tann was not supposed to be in the store because he had once threatened to shoot Ms. Davenport and her husband. Defendant assigns as error the admission of irrelevant evidence that Tann was in the store and that he was not supposed to be there because of the threat.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988). In this case the prosecution sought to prove premeditation and deliberation by several theories, one of which was that defendant knew the store employees would be coming to work early and that he could ambush them when they would be at the store alone. To prove this theory, the prosecution had Ms. Davenport testify that only the owners of the store and the meat department employees knew that someone would be at the store early. Ms. Davenport testified that Grantson Taylor worked in the meat department and that he was a friend of Freddie Tann and the defendant. Further, she testified that the reason she noticed that Tann was in the store the day before the robbery was that he was not supposed to be there. When asked why Tann was not supposed to be in the store, Ms. Davenport stated that Tann had threatened to shoot her and her husband. Ms. Davenport knew of the association of Tann and defendant because Tann, who once worked for the Davenports, had previously helped defendant get a job working for the Davenports at a store they had owned years before.

Thus, the prosecution sought to tie Taylor's knowledge of the early opening to his discussion with Tann at the store the day before the robbery. The key to Ms. Davenport's memory of Tann in the store was the fact that he had previously threatened her. Tann's friendship with defendant, then, established the knowledge defendant required for his ambush. Though the relationship is tenuous, the facts to which Ms. Davenport testified are relevant

to the theory the prosecution sought to prove. This assignment of error is without merit.

[20]   Defendant's next assignment is that the trial court erroneously allowed State's witness Hoggard to testify about victim Kurczek's religious statements made during the ambulance ride to the hospital. Hoggard testified that Kurczek "said some religious things and I picked out the words Jesus and Father out of what he said." Defendant acknowledges that the fact that Kurczek spoke during the ambulance ride is relevant, but argues that the religious content of the statements should have been disallowed. The record clearly shows, however, that the trial court correctly instructed the jury, before witness Hoggard gave his statement, that the testimony was before it only to show the consciousness of Kurczek. Further, defendant did not object at trial to the religious aspect of the statement. This assignment of error is overruled.

[21]   Defendant also argues it was improper for the district attorney to ask questions regarding whether Kurczek was able to make peace with the Lord before he died. The trial court properly sustained objections to those questions. We have held that repeated attempts by a district attorney to ask improper questions may require a new trial, *see State v. Phillips*, 240 N.C. 516, 82 S.E.2d 762 (1954), but where, as here, the improper questions are not persistently repeated, the trial court's decision to sustain defense counsel's objection is sufficient to prevent any prejudicial error. *See State v. Greene*, 285 N.C. 482, 495, 206 S.E.2d 229, 237 (1974); *State v. Ball*, 277 N.C. 714, 720, 178 S.E.2d 377, 381 (1971).

[22]   Defendant next contends that the district attorney committed prosecutorial misconduct rising to the level of plain error by arguing in both the guilt and sentencing phases that defendant aimed at Kurczek's head when he shot him the second time as defendant left the store. Defendant argues that there is neither evidence in the record, nor reasonable inference therefrom, to support such a contention and that he thus is entitled to a new trial. *State v. Britt*, 288 N.C. 699, 711, 220 S.E.2d 283, 291 (1975).

Ordinarily, defense counsel must object to allegedly improper arguments by the prosecution in order to preserve the issue for review. *See State v. Brock*, 305 N.C. 532, 538, 290 S.E.2d 566, 571 (1982). Although we have relaxed that rule somewhat in capital cases, the impropriety alleged must be extreme before we will conclude that the trial judge abused his discretion in failing to

correct *ex mero motu* a prosecutor's argument. *Id.* at 537, 290 S.E.2d at 570. Counsel may argue before the jury all the facts in evidence and all reasonable inferences therefrom. *State v. Noland*, 312 N.C. 1, 15, 320 S.E.2d 642, 651 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L. Ed. 2d 342 (1985).

The evidence in this case tends to show that defendant shot Kurczek once from short range in the chest and that Kurczek fell face forward towards the office door. Defendant then went with Carr to a second office where the cash register tills were kept. After taking money from the tills, defendant walked back by the office where Kurczek still lay. Defendant crouched down at the door to the office and shot Kurczek again. The second shot entered Kurczek's right shoulder and travelled laterally towards the midline of the body. This evidence permits a reasonable inference that defendant aimed at Kurczek's head, as the district attorney argued. Defendant, therefore, is not entitled to relief under this assignment of error.

[23] Defendant's last assignment in the guilt phase is that the trial court erroneously instructed the jury on theories of premeditation and deliberation that were not supported by the evidence. The trial court instructed the jury that it could infer premeditation and deliberation from the use of grossly excessive force under the circumstances, the infliction of lethal wounds after the victim was felled, the brutal and vicious nature of the killing, and the manner in which the killing was done. This instruction contains "examples of circumstances which, if found, the jury could use to infer premeditation and deliberation. It is not required that each of the listed [examples] be proven beyond a reasonable doubt before the jury may infer premeditation and deliberation." *State v. Cummings*, 326 N.C. 298, 315, 389 S.E.2d 66, 76 (1990).

Again, we note that defendant has failed to preserve this alleged error by objecting to the instruction at trial. N.C.R. App. P. 10(b)(2). Defendant will be entitled to relief, then, only if he can show that the trial court's instructions contain "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982) (emphasis in original) ). We cannot say that such

error occurred in this case where there is ample evidence that defendant shot Kurczek twice from short range in the course of a robbery. This evidence supports the court's instruction that premeditation and deliberation can be inferred from a brutal and vicious killing or the use of grossly excessive force under the circumstances. In addition, there was evidence that defendant inflicted upon Kurczek a blow from a lethal weapon while Kurczek was helpless and unarmed. We have held that such action supports an inference of premeditation and deliberation. *State v. Barbour*, 295 N.C. 66, 72, 243 S.E.2d 380, 384 (1978). Therefore, the State did not need to prove that the second shot caused Kurczek's death for the instruction given to be warranted.

Even if the instructions given by the trial court were not supported by the evidence, defendant has not shown plain error that prejudiced his trial because there was ample evidence from which the jury could have found premeditation and deliberation. *See id.; State v. Brown*, 315 N.C. 40, 59, 337 S.E.2d 808, 823 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Zuniga*, 320 N.C. at 263, 357 S.E.2d at 916.

SENTENCING PHASE

[24] Defendant contends, and the State concedes, that the instructions imposed a unanimity requirement for finding mitigating circumstances and were therefore improper under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990); *see also State v. McKoy*, 327 N.C. 31, 394 S.E.2d 462 (1990).

> In *McKoy* the United States Supreme Court held unconstitutional North Carolina's capital sentencing jury instructions which required the jury to find the existence of a mitigating circumstance unanimously in order for any juror to consider that circumstance when determining the ultimate recommendation as to punishment. The Court reasoned that North Carolina's "unanimity" requirement was constitutionally infirm because it "prevent[ed] the sentencer from considering all mitigating evidence" in violation of the eighth and fourteenth amendments.

*State v. Sanderson*, 327 N.C. 397, 402, 394 S.E.2d 803, 805-06 (1990) (citations omitted).

Our review of the record establishes that the trial court did give the instruction requiring that the jury be unanimous before

SMITH v. NATIONWIDE MUTUAL INS. CO.

[328 N.C. 139 (1991)]

it could find a mitigating circumstance. Under *McKoy*, this requires a new sentencing proceeding unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 462; N.C.G.S. § 15A-1443(b) (1988). The trial court submitted nine specific mitigating circumstances and the jury, operating under the unanimity instruction, found only one. There was evidence to support at least some of the nine additional mitigating circumstances submitted. The State does not deny that the unanimity requirement may have affected at least one juror's vote on at least some of the nine remaining mitigating circumstances and thus affected the jury's sentencing recommendation. *See State v. Brown*, 327 N.C. 1, 29-30, 394 S.E.2d 434, 451-52 (1990). We agree that we cannot conclude that the *McKoy* error was harmless, and we thus conclude that defendant must receive a new sentencing proceeding.

Defendant's remaining assignments of error relate to issues that defendant recognizes have previously been decided by this Court contrary to his position, but which he nonetheless brings forward to preserve for further appellate review. As we have previously decided those issues contrary to defendant's position, defendant's related assignments of error are overruled. *See State v. Payne*, 327 N.C. 194, 210, 394 S.E.2d 158, 166 (1990).

Guilt phase: no error.

Sentencing phase: new sentencing proceeding.