STATE OF NORTH CAROLINA v. LINWOOD JOHNSON

No. 511A87

(Filed 5 May 1988)

**Criminal Law § 75.14— first degree murder—waiver of rights—findings as to mental capacity sufficient**

The trial court in a first degree murder prosecution did not err in finding that defendant was not depressed and in concluding that defendant freely, knowingly and intelligently waived his constitutional rights where the majority of officers present during different stages of the interrogation testified that defendant appeared normal; there was substantial evidence tending to show that defendant was not actively suicidal at the time he arrived at the police station and rendered his confession; a psychiatrist testified during cross-examination that although defendant had a feeling he should be punished for what he had done, he was still aware of his rights and what he could do to protect those rights at the time he made his confession; defendant was advised on three separate occasions of his constitutional rights and the consequences flowing from a waiver of those rights; and defendant testified that at the time he

confessed he knew that he did not have to speak to the officers, that he had the right to legal representation, and that he could stop the interrogation at any time.

APPEAL by defendant from judgment imposing sentence of life imprisonment entered by *Read, Jr., J.*, at the 27 April 1987 Criminal Session of Superior Court, CUMBERLAND County, upon a jury verdict of murder in the first degree. Heard in the Supreme Court 16 March 1988.

*Lacy H. Thornburg, Attorney General, by Thomas J. Ziko, Assistant Attorney General, for the State.*

*Mary Ann Talley for defendant-appellant.*

FRYE, Justice.

The sole issue on this appeal is whether the trial court erred in finding that defendant knowingly and understandingly waived his *Miranda* rights at the time he confessed to killing the victim. We hold that the trial court did not err.

On the evening of 1 January 1986, defendant walked into the Fayetteville, North Carolina, Law Enforcement Center and presented himself to the desk officer on duty. Defendant identified himself and told the officer that he was there to turn himself in. Officer Davis had been monitoring the police radio and was aware that defendant was a suspect in an assault that had occurred earlier that evening. Upon asking defendant to place his hands on the counter, the officer noticed that defendant's hands were covered with blood and that there was blood splattered on his clothing. However, defendant did not appear to be bleeding. After quickly frisking defendant, Officer Davis handcuffed defendant's wrists behind his back, informed him he was under arrest, and read him his *Miranda* rights. In response to the officer's questions defendant stated that he understood his rights. He was then handcuffed to a chair where he remained for the next fifteen to twenty minutes.

After defendant had been in custody for approximately sixteen minutes, Sergeant Scearce of the Fayetteville Police Department arrived at the law enforcement center and assumed custody of defendant. While taking defendant from the front desk area to

the watch commander's office, Sergeant Scearce noticed some very minor cuts on defendant's wrists. He therefore called the emergency medical technicians and asked them to come to the law enforcement center to attend to defendant. After calling the medical technicians, Sergeant Scearce used a preprinted form to once again advise defendant of his *Miranda* rights. After being read each statement of his rights, defendant indicated that he understood that right by initialing the applicable statement. At the end of that process defendant signed the form indicating that he had read the statement of his rights, understood those rights, and was voluntarily waiving them without coercion or promise of any kind. While defendant was in Sergeant Scearce's custody he asked whether the victim was dead yet, but Sergeant Scearce did not respond since he did not know whether the victim had died.

The medical technicians arrived shortly after defendant had executed the waiver of rights form. The medical technician who treated the defendant noticed that defendant had minor wounds on the underside of both of his wrists, but the wounds were not bleeding at that time. After bandaging the wounds, the medical technician advised the police officers present that although the cuts were not life threatening, they should be treated by a doctor. This was subsequently done.

Sergeant Pulliam of the Fayetteville Police Department then took defendant from the watch commander's room to an interrogation room in the law enforcement building. Once in the interrogation room, Sergeant Pulliam reviewed the waiver of rights form with defendant. Having satisfied himself that defendant understood all of his rights and had voluntarily waived those rights, Sergeant Pulliam asked defendant to relate to him in defendant's own words the events preceding defendant's arrival at the law enforcement center. Sergeant Pulliam then asked defendant to repeat his statement while Pulliam wrote it down. Finally, Sergeant Pulliam reviewed the written statement with defendant who then signed it.

In his confession defendant stated that he had been in love with the victim, Alicia Council, and that after four months of dating her, she had a baby and informed defendant that he was the father. A few months before the killing, however, she told him that the baby was not his. A few days before the killing

someone had told defendant that Alicia was seeing another man. When defendant confronted Alicia with that information she lied to him and said that the other man was just a friend of a friend. By that time defendant "was beginning to realize that she was just using [him]." On the morning of 1 January 1986, Alicia came to defendant's house to borrow a jacket and defendant loaned it to her. After she left his house defendant decided to follow her. Defendant's confession continues as follows:

> I knew she was probably meeting someone there. I returned home and waited for her. I made up my mind that I was going to take care of the problem once and for all.
>
> I got my army dagger and I waited for her to come back to my house to bring back my jacket. It was about 7:30 p.m. or 7:45 p.m. when she returned. Her sister, Sheila, was with her. Her sister said she was going to the package store and she left. I was upset. I stabbed her, Alicia, at least twice. I really don't know how many times. I know I stabbed her in the stomach and in the back. She fell to the ground.
>
> I went into the house and got a blanket and placed the blanket over her. Sheila came back from the store. Sheila asked what was wrong with Alicia. I still had the knife in my hand standing over top of Alicia. I told Sheila Alicia was dead, and I told her to go get her mother. I decided to go and turn myself in to the police.
>
> I went down Phillips Street to the railroad tracks and then followed the railroad tracks on in to town. I still had the knife with me. I thought about what I had done and decided to take my own life. And when I got near Vick's Drive-in, I cut both my wrists. I threw the knife behind one of the dumpsters. I left there and continued to walk to the police station.
>
> I walked in and told an officer, I came to turn myself in to him.

After receiving defendant's confession and upon learning that the victim had died, the Fayetteville Police served warrants on defendant, charging him with the murder of Alicia Council. Defendant was then indicted for first degree murder. Pursuant to defendant's motion, the case was declared non-capital, the court

---

State v. Johnson

---

having found that there were no aggravating circumstances as described in N.C.G.S. § 15A-2000 applicable to this case. Defendant was tried by a jury and was found guilty of murder in the first degree. The trial judge sentenced defendant to life imprisonment.

Prior to trial defendant filed a motion to suppress the confession. At the suppression hearing, after receiving evidence concerning defendant's motion to suppress, the trial judge found, *inter alia*, that defendant "made a voluntary and understanding statement to Officer Pulliam which was reduced to writing by Officer Pulliam and introduced into evidence at [the] hearing as State's Exhibit No. 2VD. That at this time the Defendant was not depressed or suicidal and he was in contact with reality." The court then concluded that defendant had freely, knowingly and intelligently waived his constitutional rights and that the statements to the officers were freely, voluntarily and understandingly made. The motion to suppress was accordingly denied.

On appeal defendant contends that the trial court erred in its finding of fact that defendant was not depressed at the time he waived his constitutional rights and therefore erred in ruling that the waiver and statement were knowingly and understandingly made.

In determining whether an in-custody confession is admissible "the totality of the circumstances surrounding the interrogation" must be examined. *Moran v. Burbine*, 475 U.S. 412, 421, 89 L.Ed. 2d 410, 421 (1986). An inculpatory statement made to law enforcement officers while a defendant is in custody is admissible as evidence of a defendant's guilt whenever the totality of the circumstances shows that the defendant knowingly, voluntarily and intelligently waived his constitutional rights. *State v. Reese*, 319 N.C. 110, 353 S.E. 2d 352 (1987). In assessing the totality of the circumstances the basis of the inquiry is two-dimensional:

> First, the relinquishment of the right must have been voluntary in the sense that it was a product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. at 421, 89 L.Ed. 2d at 421.

Defendant does not contend that his waiver and confession was a result of intimidation, coercion or deception. Instead, defendant's argument addresses the second prong of the test set out in *Burbine*. More specifically, defendant argues that the evidence shows that he was depressed at the time of the interrogation and that his depression impaired both his ability to make a knowing and understanding abandonment of his rights against self-incrimination and his ability to understand the consequences of the decision to abandon these rights. Essentially defendant contends, in light of the evidence presented at the suppression hearing, that the trial court's finding of fact that defendant was not depressed was erroneous.

If there is competent evidence to support a trial court's finding of fact, that finding is binding on this Court. *State v. Hill*, 294 N.C. 320, 240 S.E. 2d 794 (1978). Moreover, merely because there is evidence from which a different conclusion could have been reached does not warrant a reversal of the trial court's finding of fact. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335 (1983). It is the trial court's duty to resolve any conflicts and contradictions that may exist in the evidence. *State v. Reese*, 319 N.C. 110, 353 S.E. 2d 352.

Defendant contends that the evidence at the suppression hearing belies the validity of the trial court's findings of fact and conclusion of law. He argues that the following evidence shows that at the time he confessed he was suffering from depression which impaired his judgment and therefore the trial court's finding to the contrary is not supported by the evidence: During the interrogation, Officer Pulliam was aware that defendant had made a suicide attempt before turning himself in to law enforcement officers; paramedics were called to treat defendant's wounds; and Investigator Willis Stone testified that defendant appeared "somewhat depressed." Further, after defendant was charged with murder, he was taken to the hospital and then to the jail, where a psychiatrist prescribed some anti-depressant medication, and where defendant was placed on suicide watch. Finally, Dr. Levenberg, a psychiatrist who examined defendant twenty days after he gave his confession, testified that, in his opinion, defendant was depressed at the time he made the confession and his depression would have clouded his judgment. He testified further that, in his opinion, a person who is actively suicidal would not be

terribly concerned about the impact of a confession, whether it could hurt him at a later time.

If there is substantial evidence to support the trial court's finding of fact it will not be disturbed on appeal, notwithstanding the fact that there was evidence from which a different finding could have been made. *See State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335. We thus consider whether there was substantial evidence to support the trial court's finding of fact that defendant was not depressed.

The majority of the officers present during different stages of the interrogation testified that defendant appeared normal: Officer Davis testified that although defendant appeared slightly nervous, he also appeared to be in full control of what he was saying and doing; Officer Scearce testified that defendant appeared nervous, but in touch with reality; Officer Pulliam testified that defendant appeared like a normal person in every respect; Officer Stone, who was with Officer Pulliam during the interrogation, while testifying that defendant seemed somewhat depressed but not suicidal, also testified that defendant appeared normal—cooperative, polite, and calm—and completely aware of everything going on. Also, the emergency medical technician testified that defendant appeared calm and cooperative.

Furthermore, there is substantial evidence which tends to show that defendant was not actively suicidal at the time he arrived at the police station and rendered his confession: defendant was not bleeding when he arrived at the police station; the emergency medical technician attending defendant testified that defendant's wounds to his wrists were quite minor and not life threatening; the wounds did not require any sutures and were simply bandaged; placing defendant on a suicide watch after he was in jail was done, not because there was any substantial belief that defendant was suicidal, but as a routine practice followed when someone such as defendant has wounds that appear to be self-inflicted; and, although there is no evidence as to when the anti-depressant medication was prescribed, the evidence does show it was not prescribed until defendant was placed in jail, a substantial time after defendant confessed and after he was told that the victim had died and that he was charged with first degree murder.

Thus, the evidence before the trial court does not conclusively support Dr. Levenberg's opinion that defendant was actively self-destructive or psychotic. Moreover, during cross-examination, Dr. Levenberg testified that although defendant had a feeling that he should be punished for what he had done, he was still aware of his rights and what he could do to protect those rights at the time he made his confession. Furthermore, prior to making his confession, defendant was advised on three separate occasions of his constitutional rights and the consequences flowing from any waiver of those rights. Finally, defendant testified that at the time he confessed he knew that he did not have to speak to the officers, that he had the right to legal representation, and that he could stop the interrogation at any time.

Thus, under the totality of the circumstances, there is substantial evidence to support the trial court's findings of fact. It is the trial court's duty to resolve any conflicts and contradictions existing in the evidence. We hold, therefore, that the trial court did not err in finding that defendant was not depressed and in concluding that defendant freely, knowingly and intelligently waived his constitutional rights. Since defendant was fully aware of the nature of the rights he was abandoning and the consequences of his decision, the trial court did not err in denying defendant's motion to suppress his confession.

No error.