STATE OF NORTH CAROLINA v. SWINDALL BROWN

No. 180A93

(Filed 30 December 1994)

**1. Criminal Law § 181 (NCI4th)— competency to stand trial— refusal to assist defense—attitude as basis**

The trial court did not err by concluding that defendant was competent to stand trial where the evidence in the record supported findings by the trial court that, although defendant refused to assist in his own defense, defendant did not suffer from a mental incapacity, and his attitude, rather than a mental illness or defect, prevented him from cooperating in the preparation of his defense.

Am Jur 2d, Criminal Law §§ 95 et seq.

## 2. Constitutional Law § 266 (NCI4th)— trial strategy—conflict between defendant and counsel—defendant's wishes followed—right to counsel

The trial court did not violate defendant's right to counsel when it ruled that defendant's wishes must prevail whenever he and his attorney reached an impasse regarding trial strategy where defendant never waived his right to counsel, and the trial court ensured that defendant was fully informed about the consequences of his decision and his attorney's opinions before ordering counsel to proceed according to defendant's wishes.

Am Jur 2d, Criminal Law §§ 732 et seq., 967 et seq.

## 3. Evidence and Witnesses §§ 927, 1009 (NCI4th)— statements by victim's wife—unavailable witness—guarantees of trustworthiness—admissibility under residual hearsay exception—right of confrontation

Two statements made by a murder victim's wife to a police detective possessed equivalent circumstantial guarantees of trustworthiness for their admission into evidence at defendant's murder trial under the residual hearsay exception set forth in Rule 804(b)(5) where the wife later died from AIDS; the wife gave her first statement only one week after the murder; she freely admitted the nature of her relationship with defendant and described how the victim armed himself with a knife before leaving her home when he learned that defendant was outside the home, which could support an inference that the victim provoked defendant; the wife was near death at the time of her second, tape-recorded statement; she could no longer work, was often bed-ridden, and believed in good faith she would not be strong enough to testify even if she were alive at the time of the trial; and the statements mirrored each other in all respects. Furthermore, this evidence showed that the victim's wife was worthy of belief so that admission of the statements did not violate the Confrontation Clause of the Sixth Amendment. N.C.G.S. § 8C-1, Rule 804(b)(5).

Am Jur 2d, Evidence §§ 701 et seq.

Residual hearsay exception where declarant unavailable: Uniform Evidence Rule 804(b)(5). 75 ALR4th 199.

**4. Homicide § 552 (NCI4th)— first-degree murder—instruction on second-degree murder not required—no abdication of duty by court**

There was no evidence negating the State's evidence of premeditation and deliberation in a first-degree murder prosecution which required the trial court to instruct the jury on the lesser included offense of second-degree murder where the evidence tended to show that defendant waited outside the apartment of the victim's estranged wife for around thirty minutes while the victim and his wife dined together; when the victim left the apartment, defendant ran toward him, shouted "[t]here's that MF," and began shooting; defendant fired four shots at the victim, two of which were fatal, and ran away; after surrendering to the authorities, defendant asked several different officers if he had "gotten" the victim; while the victim had placed a knife in the front of his pants, the knife was still in his pants, concealed by his shirt, when he was killed; and the absence of gunshot residue on the victim's clothing indicates that he was not shot at close range.

**Am Jur 2d, Trial §§ 1427 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

**5. Homicide § 550 (NCI4th)— first-degree murder—failure to instruct on second-degree murder—wishes of defendant—no abdication of responsibility**

The trial court did not abdicate its duty to instruct on all charges supported by the evidence in a first-degree murder trial by its failure to instruct on the lesser included offense of second-degree murder when defendant had requested, against the advice of counsel, that the court instruct only on first-degree murder where the record shows that the court based its decision on the absence of evidence to support a charge on second-degree murder and not on the wishes of the defendant.

**Am Jur 2d, Trial §§ 1427 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Read, J., at the 11 January 1993 Criminal Session of Superior Court, Durham

County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 11 April 1994.

*Michael F. Easley, Attorney General, by Dennis P. Myers, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried non-capitally for the first-degree murder of Michael LeRoy Cobb. The jury found him guilty, and the trial court imposed a sentence of life imprisonment. We find no error.

At trial the State presented evidence tending to show that Michael Cobb was fatally shot on 18 September 1991 at the corner of Glendale Avenue and West Geer Street in Durham, North Carolina. The victim had a butcher knife tucked into his pants. An autopsy revealed four gunshot wounds to the victim's body—one each to the left chest, left temple, left cheek and left chin. All four bullets were recovered from the body. The wounds to the chest and temple caused the victim's death.

Agent Eugene Bishop, an expert in firearm identification at the State Bureau of Investigation, testified that the four bullets removed from the victim's body were .32 caliber and had been fired from the same weapon. He also testified that the victim's shirt contained no gunpowder or other residue. Most weapons leave residue on material when fired two feet or less from that material. Bishop could not determine the distance from which the victim was shot because the gun had not been recovered. He did testify, however, that the minimum distance from shooter to victim might have been five to seven feet; the victim was not shot from point-blank range.

Cory Pettiford, age fourteen, testified that on the evening of 18 September 1991 he and his stepsister were returning from a local park. When they reached the apartment complex at the corner of West Geer Street and Glendale Avenue, Cory saw a black man in his thirties run across the street carrying a cereal box and a silver gun. The man yelled, "[t]here goes that MF," then threw down his cereal box and started shooting. Cory testified he heard four or five shots before the man ran away.

Daphene Lyons and Carolyn Woods testified they lived in the same apartment building as Julia Cobb, the victim's wife. At approximately 7:30 p.m. on 18 September 1991, they were talking outside Lyons' apartment, which is next door to Cobb's. They saw defendant sitting on some steps across the street and looking at their apartment building. After about thirty minutes, defendant crossed the street and approached them. Woods and Lyons went inside, and Lyons telephoned Cobb at Woods' behest to warn her about defendant's presence. Woods then returned to her own apartment. Lyons heard four or five gunshots approximately five minutes after defendant crossed the street and approached the building. Woods testified she heard noises, which turned out to be gunshots, about five minutes after she and Lyons went inside. On cross-examination Woods testified she acted as a liaison between Cobb and defendant until mid-September 1991 when Cobb broke off the relationship to reconcile with the victim.

Robert Meeks, age thirteen, lived in the same building as Cobb, Lyons and Woods. On 18 September 1991, at approximately 7:30 p.m., Meeks was watching television in his bedroom when he heard several gunshots. Looking out his window, he saw the victim tremble and begin to fall. He also saw defendant throw an object down and run up Glendale Avenue. Meeks testified that defendant stayed about one and one-half car lengths away from the victim. Though Meeks admitted on cross-examination that he was not positive he saw defendant, he stated that the man he saw had defendant's size and complexion.

Detective Daryl Dowdy testified that defendant turned himself in at the magistrate's office on 18 September 1991. Defendant was transported to police headquarters for questioning; upon arrival and before Dowdy asked any questions, defendant asked, "did I get Cobb?" Other officers also testified they heard defendant make this statement. Dowdy then informed defendant of his *Miranda* rights and took a statement from him. After defendant returned to the magistrate's office, Dowdy issued a warrant for his arrest for the murder.

Defendant presented evidence in his own defense but did not testify. Linda Jackson testified that she worked with defendant and Cobb at Royal Home Fashions. Jackson believed Cobb and the victim had marital problems and that Cobb had been dating defendant. Sam Dewitt, another co-worker, recalled that defendant left work early on one occasion after the victim threatened him. He also testified that the victim had once flattened the tires on Cobb's automobile. Michael Braswell testified that he had shared an apartment with defendant

and knew Cobb as defendant's girlfriend. Larry Ward testified he had known defendant since childhood and that defendant had been dating Cobb since 1985. Ward also testified he had never known defendant to threaten anyone. Felicia Allen, Julia Cobb's daughter, testified that she had called the police on numerous occasions to break·up fights between the victim and her mother prior to their separation. She denied telling an investigator that the incident on 18 September 1991 occurred because the victim left Cobb's apartment to confront defendant. On cross-examination Allen admitted that her mother broke up with defendant in October or November of 1990 when he burned her car. Following that incident, Allen's grandmother told defendant to stay away from their home. Allen did not believe her mother had had any further contact with defendant. Finally, Allen testified that her mother remained mentally competent until her death from Acquired Immune Deficiency Syndrome (AIDS) on 29 June 1992.

[1] Defendant contends the trial court erred by finding him competent to stand trial and to assist in his defense in a rational and reasonable manner. He argues that he failed the statutory test for competence because he was unable to communicate with his attorney to the extent necessary for the preparation of his defense. We disagree.

A pretrial hearing was held before Judge Orlando Hudson to determine whether defendant was competent to stand trial. Dr. Patricio Lara, who evaluated defendant between 1 May and 22 May 1992 at Dorothea Dix Hospital, testified about defendant's competence. He stated that defendant had low to average intelligence, thought and spoke coherently, and operated under no delusional or impaired perceptions. Dr. Lara further testified that defendant exhibited a "tense and guarded" attitude and a severe distrust of people which indicated a "personality issue" that would render defendant unable to work with a lawyer until that lawyer resolved or overcame defendant's emotional problems. Dr. Lara conceded on cross-examination that resolution of defendant's problems could require professional psychiatric intervention. He opined, however, that defendant understood the basic facts of the case, the nature and purpose of the charges against him, and his role in the proceedings, and that he could assist defense counsel in the presentation of a defense. He observed no evidence of psychosis or severe mental illness. Dr. Lara concluded that defendant was competent but might choose not to participate in his defense due to his "perception, social values and mistrust, . . . not because of a basic incapacity."

Based on Dr. Lara's testimony, Judge Hudson found that (i) Dr. Lara is a forensic psychiatrist; (ii) Dr. Lara's diagnosis of defendant was adjustment disorder with mixed disturbance of emotions and personality disorder; (iii) Dr. Lara did not find defendant's condition to impair his understanding of the nature and seriousness of the pending charges or the court proceedings; and (iv) Dr. Lara found that defendant was capable of understanding his position in the law and of assisting his attorney in the preparation of his defense. He then concluded that defendant was competent to stand trial:

> [D]efendant does understand the seriousness of the charges against him, the nature of the court proceedings, . . . he does understand his position in the law, . . . he is capable of assisting his attorney in the preparation of his defense. And . . . he, therefore, has the capacity to proceed to trial on these charges.

The statutory test for determining a defendant's mental capacity to stand trial is as follows:

> No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner. This condition is hereinafter referred to as "incapacity to proceed."

N.C.G.S. § 15A-1001(a) (1988). This "statute provides three separate tests in the disjunctive. If a defendant is deficient under any of these tests he or she does not have the capacity to proceed." *State v. Shytle*, 323 N.C. 684, 688, 374 S.E.2d 573, 575 (1989).

Defendant argues that Dr. Lara's testimony revealed defendant had the future potential, but not the current capacity, at the time of trial to assist in his defense in a rational manner. He maintains the record proves he suffered from a debilitating level of paranoia at the time of his trial and was incapable of rationally assisting his attorney in his defense. Therefore, he argues, he could not "assist in his own defense in a rational or reasonable manner" and did not have the mental capacity to stand trial.

The record does reveal that defendant failed to cooperate with his attorney on several occasions. At the pretrial competency hearing Dr. Lara conceded on cross-examination that defendant's problem with cooperation would partially impair his ability to participate in

his trial. Defense counsel made numerous motions to withdraw both before and during trial on the grounds that defendant would not divulge any information regarding the incident of 18 September 1991.

The record also reveals, however, that defendant's behavior stemmed from a refusal—not an inability—to assist in his own defense. Dr. Lara testified that defendant's failure to participate, while a "major obstacle in the work with the attorney," stemmed from defendant's "perception, social values and mistrust," not from "a basic incapacity." Additionally, defendant asked the trial court on the first day of trial to appoint a new attorney for him. The court placed defendant under oath and conducted questioning for the record; defendant's responses revealed that he suffered from a bad attitude, not a mental incapacity. He stated that he had attended high school through the eleventh grade and later had earned a General Equivalency Degree. He denied having any type of mental handicap. He understood that he was entitled to be represented by a lawyer, but not by a lawyer of his choice. Finally, the following colloquy occurred:

> [COURT]: Mr. Brown, I have heard nothing here that would be grounds for removal of your attorney, sir. He says that he has worked out a defense for you, he has prepared a defense for you, and he is ready to go to trial for you, but he needs your cooperation. Now, why do you say that you cannot cooperate with your attorney?
>
> [DEFENDANT]: I didn't say that.
>
> [COURT]: Well, can you cooperate with him?
>
> [DEFENDANT]: I refuse to cooperate with him.
>
> [COURT]: You refuse to cooperate with him?
>
> [DEFENDANT]: Yeah.
>
> [COURT]: In other words, you can cooperate with him, but you refuse to?
>
> [DEFENDANT]: I refuse to cooperate with him.

Based on the foregoing, the trial court could properly find that defendant did not suffer from a mental incapacity—that his attitude, rather than a mental illness or defect, prevented him from assisting in his own defense. It thus could properly conclude that he was competent to stand trial. This assignment of error is therefore overruled.

**[2]** Defendant next contends the trial court effectively allowed him to proceed without counsel but did not ensure that he properly waived his constitutional right to counsel. On several occasions, both before and during the trial, defense counsel notified the court that defendant refused to cooperate in the preparation of his defense. The trial court, relying on *State v. Ali*, 329 N.C. 394, 407 S.E.2d 183 (1991), ruled that defendant's wishes must prevail whenever he and his attorney reached an impasse regarding trial strategy. Defendant argues that the court should have either allowed him to proceed *pro se* or ordered him to abide by the decisions of his attorney. We disagree.

A court may not require an indigent defendant to represent himself at trial because the Sixth Amendment to the United States Constitution guarantees the assistance of counsel in a serious criminal prosecution. *Faretta v. California*, 422 U.S. 806, 818, 45 L. Ed. 2d 562, 572 (1975); *Gideon v. Wainright*, 372 U.S. 335, 9 L. Ed. 2d 799 (1963); *see Ali*, 329 N.C. at 403, 407 S.E.2d at 189. The language and structure of the Sixth Amendment also protect a defendant's right to self-representation; a fully informed criminal defendant has the constitutional right to waive the assistance of counsel. *Faretta*, 422 U.S. at 818-21, 45 L. Ed. 2d at 572-74. Defendant here never waived his right to counsel, however. Every time the trial court asked if he wanted to dismiss his attorney and represent himself, defendant chose to keep his attorney. The trial court could not dismiss defendant's attorney against defendant's wishes. Therefore, it had to decide whose strategy should prevail, defendant's or defense counsel's, when the two conflicted. Relying on *Ali*, the court concluded that defendant's wishes regarding trial tactics must control.

We held in *Ali* that a trial court did not violate a defendant's right to counsel when it allowed him, not defense counsel, to decide whether to exercise a peremptory challenge. We noted that tactical decisions—such as which witnesses to call, which motions to make, and how to conduct cross-examination—normally lie within the attorney's province. "However, when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship." *Ali*, 329 N.C. at 404, 407 S.E.2d at 189.

Defendant here held strong opinions about trial strategy, jury instructions, and the examination of witnesses. Defense counsel believed that abiding by defendant's wishes contravened his client's

best interests and violated his own ethical obligations. As required by *Ali*, counsel notified the court at each impasse "of the circumstances, [his] advice to the defendant, the reasons for the advice, the defendant's decision and the conclusion reached." *Id*. Further, the trial court ensured that defendant was fully informed about the consequences of his decisions and his attorney's opinions before ordering counsel to proceed according to defendant's wishes. We conclude that the court properly interpreted and applied our decision in *Ali*. This assignment of error is therefore overruled.

[3] Defendant next contends the trial court erred by admitting two out-of-court statements under Rule 804(b)(5). He argues that the statements were not admissible under any exception to the hearsay rule and that admitting them violated his Sixth Amendment right to confront the witnesses against him. We disagree.

At the pretrial hearing before Judge Hudson defendant moved to suppress two statements made by Julia Cobb, the victim's wife. Detective Daryl Dowdy of the Durham Police Department testified that he interviewed Cobb twice—first on 25 September 1991 and again in a taped interview on 30 May 1992. Both interviews occurred in Cobb's home. Cobb gave the following information during the first interview: Cobb had broken up with defendant approximately four months before the shooting; since then defendant had threatened to kill both Cobb and the victim on numerous occasions. On 13 September 1991 defendant told Cobb, "If I can't have you, your husband is not going to have you either." Cobb invited the victim to her home for dinner on the evening of 18 September 1991. As they ate, they saw defendant out the window. A few minutes later Cobb received a telephone call from a neighbor warning her that defendant was in the neighborhood. The victim prepared to leave around 8:00 p.m.; he placed a kitchen knife inside the front of his pants, covering the handle with his shirt. Cobb walked the victim to the door and watched him go down the stairs. She heard four gunshots as he turned the corner of the building. Cobb then ran back into her apartment, looked out her kitchen window, and saw the victim lying in the parking lot. At the end of the interview, Officer Dowdy wrote a statement containing the above information which Cobb signed and adopted.

Officer Dowdy further testified he tape-recorded a second interview with Cobb on 30 May 1992 after he learned from the District Attorney's office that she was dying from AIDS. Officer Dowdy noted that Cobb appeared very ill and uncomfortable, yet alert and aware of

the purpose of the interview. Cobb's second statement essentially mirrored her first, although she admitted she had dated defendant for approximately one year before ending the relationship in an effort to reconcile with her husband. On cross-examination Officer Dowdy testified that Cobb did not die until 29 June 1992, six months before defendant's trial began. He conceded he made no effort to contact the defense with the information that Cobb was near death.

Felicia Allen, Cobb's daughter, testified that in September 1991 Cobb had stopped taking her medicine, was depressed, and could no longer work due to her illness. Allen further testified that by 30 May 1992—the date of the second interview with Officer Dowdy—Cobb needed assistance with walking due to blood clots and swelling. The swelling, which extended from Cobb's leg to her stomach, arms, and neck, caused Cobb intense pain and often confined her to bed. Cobb executed a living will and discussed funeral plans with Allen prior to 30 May 1992. Finally, Allen stated that Cobb feared she would be unable to testify in court, even if she were still alive, because of her rapidly deteriorating health.

Judge Hudson denied defendant's motion to suppress both statements. He found that the statements contained sufficient circumstantial guarantees of trustworthiness, were offered as evidence of material facts, and were more probative of those facts than any other evidence reasonably obtainable, and that admission of the statements best served the interests of justice. He therefore admitted them under Rule 804(b)(5), the residual hearsay exception.

We first address the admissibility of the statements under our Rules of Evidence. Rule 804(b)(5) provides:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . (5) Other Exceptions.— A statement not specifically covered by any of the foregoing exceptions [for former testimony, statements under belief of impending death, statements against interest and statements of personal or family history] but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

N.C.G.S. § 8C-1, Rule 804(b)(5) (1992). In *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986), this Court noted the six-part inquiry in which the trial court must engage in determining the admissibility of hearsay under Rule 804(b)(5). Only the third factor is involved here: "The trial judge . . . must include in the record his findings of fact and conclusions of law that the statement possesses 'equivalent circumstantial guarantee[s] of trustworthiness.'" *Triplett*, 316 N.C. at 9, 340 S.E.2d at 741. In weighing these guarantees, a trial court must consider:

> (1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination. . . . Also pertinent to this inquiry are factors such as the nature and character of the statement and the relationship of the parties.

*Id.* at 10-11, 340 S.E.2d at 742.

The trial court here made all six findings required by *Triplett* and fully considered the question of the statements' trustworthiness. In its order it made the following findings of fact relevant to the question of trustworthiness:

> 10. . . . Julia Cobb, to the exclusion of all other persons, was able to observe the decedent victim and his reaction upon learning that the defendant was outside Ms. Cobb's residence watching the parties and waiting for the decedent to leave. In addition, Julia Cobb, to the exclusion of all other persons, was able to accurately describe the relationship that existed between herself, [the victim] and the defendant prior to the incident of September 18, 1991.

> . . . .

> 22. . . . Julia Cobb had no relationship to the State other than that of a witness in this case.

> 23. . . . Julia Cobb described the events of September 18, 1991 to family members, Dr. Miriam Cameron, and to several members of the Durham City Police Department to include Officer Dowdy. . . . [T]hose statements were consistent with the written statement she made on September 25, 1991 and the recorded taped statement she made on May 30, 1992.

24. . . . Julia Cobb as the declarant of the above described statements was motivated to tell the truth. . . . [H]er terminal condition and immediately impending death give unqualified circumstantial guarantees of trustworthiness.

Based on these findings, the court concluded that "the statements of Julia Cobb possess equivalent circumstantial guarantees of trustworthiness" and ordered that the statements "shall be admissible evidence pursuant to . . . Rule 804(b)(5); and . . . *Triplett*, 316 N.C. 1 (1986)."

We are bound by findings of fact supported by competent evidence. *State v. Thompson*, 332 N.C. 204, 215, 420 S.E.2d 395, 401 (1992); *State v. Ross*, 329 N.C. 108, 123, 405 S.E.2d 158, 167 (1991). This holds true even if evidence exists "from which a different conclusion could have been reached." *State v. Johnson*, 322 N.C. 288, 293, 367 S.E.2d 660, 663 (1988). Substantial competent evidence supports the trial court's findings here. Cobb gave her first statement only one week after the murder. She freely admitted the nature of her relationship with defendant and described how the victim armed himself with a knife. These facts could support an inference that the victim—Cobb's husband—provoked defendant; still, Cobb included the details in her statement. She was near death at the time of her second, tape-recorded statement. She could no longer work, was often bedridden, and believed in good faith she would not be strong enough to testify, even if she were alive, at the time of trial. The statements mirrored each other in all material respects. This evidence supports the court's findings, and those findings support its conclusions. We find no error in the admission of the hearsay testimony under Rule 804(b)(5).

We next determine whether admitting the statements violated the Confrontation Clause of the Sixth Amendment. To be constitutionally admissible, hearsay must contain indicia of reliability; hearsay that falls within a firmly rooted exception to the hearsay rule inherently possesses such indicia. *Idaho v. Wright*, 497 U.S. 805, 815, 111 L. Ed. 2d 638, 652 (1990). Hearsay not within a firmly rooted exception is admissible only if supported by a showing of particularized guarantees of trustworthiness. *Id.* These guarantees arise out of the "circumstances surrounding the making of the statement," taken as a whole, "that render the declarant particularly worthy of belief." *Id.* at 819, 111 L. Ed. 2d at 655. The residual hearsay exception does not qualify as firmly rooted for Confrontation Clause purposes, *id.* at 817-

18, 111 L. Ed. 2d at 653-54, so the court must search for circumstantial guarantees of trustworthiness. The factors noted above in addressing the admissibility of Cobb's statements under the Rules of Evidence equally support their admission under Confrontation Clause analysis, for they rendered Cobb worthy of belief. This assignment of error is therefore overruled.

**[4]** In his final assignment of error, defendant contends the trial court erred by refusing to instruct the jury on second-degree murder. We disagree.

A trial court must instruct the jury on lesser included offenses supported by the evidence. *State v. Williams*, 314 N.C. 337, 351, 333 S.E.2d 708, 718 (1985). To determine whether such an instruction is necessary, a court must focus on "what the State's evidence tends to prove." *State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). A defendant charged with first-degree, premeditated and deliberate murder is entitled to an instruction on second-degree murder where the evidence raises a material question as to the existence of premeditation, deliberation or the specific intent to kill. *Strickland*, 307 N.C. at 287, 298 S.E.2d at 652.

> If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*Id.* at 293, 298 S.E.2d at 658; *see also State v. Leroux*, 326 N.C. 368, 378-79, 390 S.E.2d 314, 322, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990) ("[t]he propriety of an instruction on a lesser [included] offense is not [determined by] whether the jury could convict defendant of the lesser crime, but [by] whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements.").

The trial court determined that the verdict sheet would only contain the options of guilty of first-degree murder or not guilty, stating, "[t]here is not evidence to support a lesser included charge and the defendant doesn't specifically make a request for it." Defendant con-

tends his evidence controverted the State's evidence of premeditation and deliberation, thereby requiring the court to instruct the jury on the lesser included offense of second-degree murder. He argues, for example, that neither Carolyn Woods nor Daphene Lyons saw him holding a gun; that a history of conflict between the victim, defendant, and Cobb raises the inference that the victim provoked defendant on the night of the murder; and that the knife found on the victim further supports such an inference. Finally, he argues that the victim was not dead when defendant ran away, indicating defendant did not have the intent to kill.

None of defendant's evidence conflicts with the State's proof of the elements of first-degree murder. The evidence tended to show that on the night of 18 September 1991, defendant waited outside Cobb's apartment for around thirty minutes while Cobb and the victim dined together. When the victim left the apartment, defendant ran toward him, shouted "[t]here's that MF," and began shooting. Defendant fired four shots at Cobb, two of which were fatal, and ran away. After surrendering to the authorities, defendant asked several different officers if he had "gotten" Michael Cobb. While the State's evidence revealed that the victim had placed a knife in the front of his pants, the evidence further showed that the knife was still in his pants, concealed by his shirt, when he was killed. The absence of gunshot residue on the victim's clothing indicates he was not shot from close range. Defendant presented no evidence to negate the proof of premeditation and deliberation; thus, he was not entitled to an instruction on second-degree murder.

**[5]** Defendant also contends the trial court erroneously believed it had to abide by defendant's wishes when deciding whether to charge on second-degree murder. While such a belief would indeed constitute error, the record does not support defendant's contention. During the charge conference, the court stated at least three times that it was not inclined to instruct on second-degree murder. Twice the court noted solely the fact that the evidence failed to support a second-degree murder charge. Only once did it mention that such an instruction was unsupported by the evidence *and* contravened defendant's decision—contrary to the advice of counsel—to request an instruction only on first-degree murder. The court did not abdicate its duty to instruct on all charges supported by the evidence. It concluded, correctly, that the State's uncontroverted evidence proved each element of first-degree murder, and it therefore properly refused to instruct on murder in the second degree. While the decision coin-

cided with defendant's wishes, those wishes did not dictate the decision. This assignment of error is therefore overruled.

For the foregoing reasons, we conclude that defendant received a fair trial free from prejudicial error.

NO ERROR.