STATE OF NORTH CAROLINA v. TYRONE DAVID WILLIAMS

No. COA07-1304

(Filed 17 June 2008)

**1. Constitutional Law— Sixth Amendment—jury selection—impasse with attorney—trial tactics not the issue**

The trial court did not violate defendant's Sixth Amendment rights by prohibiting him from making final decisions about peremptory challenges when there was an alleged absolute impasse between defendant and defense counsel regarding peremptory challenges. The impasse concerned the necessity of defendant standing trial, not an impasse concerning trial tactics. Even assuming an impasse concerning trial tactics, defendant's strategy for exercising peremptory challenges was unlawfully discriminatory and defense counsel could not have complied with defendant's requests.

**2. Constitutional Law— double jeopardy—use of prior conviction**

The trial court did not err by denying defendant's motion to dismiss a habitual felon indictment where it resulted from a prior conviction used to support both a current conviction for possession of a firearm by a felon and defendant's sentencing as a habitual felon.

Appeal by Defendant from judgment entered 12 December 2006 by Judge Jay D. Hockenbury in Duplin County Superior Court. Heard in the Court of Appeals 28 April 2008.

**STATE v. WILLIAMS**

[191 N.C. App. 96 (2008)]

*Attorney General Roy Cooper, by Assistant Attorney General, Charles E. Reece for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender, Benjamin Dowling-Sender, for Defendant.*

ARROWOOD, Judge.

Tyrone David Williams (Defendant) appeals from judgments entered 12 December 2006, convicting him of assault with a firearm on a law enforcement officer as a violent habitual felon, assault with a deadly weapon inflicting serious injury as a violent habitual felon, larceny of a firearm, and possession of a firearm by a convicted felon. We find no error.

At approximately 10:00 P.M. on 10 September 2005, Officer Mitchell Anderson (Officer Anderson) of the Rose Hill Police Department, responded to a domestic dispute in Duplin County, North Carolina. Defendant and his girlfriend, Tania Brown (Brown) were "fighting in the street[.]" When Officer Anderson arrived, he observed Brown on the ground and Defendant standing over her. Defendant ran when he saw Officer Anderson's patrol vehicle. Brown was distressed but she had no visible injuries; Officer Brown pursued Defendant on foot, believing he had assaulted Brown.

Officer Anderson caught up with Defendant in a dark area, after Defendant had fallen in the chase; thereafter, Defendant stood up and approached Officer Anderson, and the two men wrestled, falling into nearby bushes. Officer Anderson told Defendant to stop resisting, but Defendant instead pronounced, "Let me go." Officer Anderson then attempted to use pepper spray to subdue Defendant; however, Defendant broke the cap off of the cannister, rendering the pepper spray inoperable. After again demanding that Officer Anderson let him go, Defendant declared, "Fine, I'm going for your gun then." Officer Anderson placed his hand over his gun to prevent Defendant from removing it from the safety holster. After Defendant continued to struggle, Officer Anderson realized his pistol was not in its holster, and Defendant again demanded that Officer Anderson let him go. Officer Anderson refused, and thereafter, he felt Defendant's hand near the side of his chest and saw the top of his gun. He saw the gun flash as it fired, and Defendant ran. The bullet lodged in Officer Anderson's left side between his rib cage and his back; and as a result of his injuries, Officer Anderson had only partial use of his left arm and shoulder.

Police discovered Defendant inside a mobile home in Onslow County, hiding underneath a bed. He later told the deputy that "[t]he gun's . . . under the bed where they found me."

Defendant's trial on the charges of assault with a firearm on a law enforcement officer, larceny of a firearm, felonious possession of a stolen firearm, assault with a deadly weapon with intent to kill inflicting serious injury, possession of a firearm by a convicted felon, and attaining both habitual felon and violent habitual felon status, began on 27 November 2006. On 8 December 2006, a jury found Defendant guilty of assault with a deadly weapon inflicting serious injury, assault with a firearm on a law enforcement officer, larceny of a firearm, felonious possession of a stolen firearm, and possession of a firearm by a convicted felon. On 11 December 2006, the jury found Defendant to be a violent habitual felon, and on 12 December 2006, the jury found Defendant to be a habitual felon. On 12 December 2006, the trial court entered judgment based on the foregoing verdicts, sentencing Defendant to concurrent terms of life imprisonment without parole for assault with a firearm on a law enforcement officer as a violent habitual felon, life imprisonment without parole for assault with a deadly weapon inflicting serious injury as a violent habitual felon, 116-149 months imprisonment for larceny of a firearm as an habitual felon, and 116-149 months imprisonment for possession of a firearm by a convicted felon as an habitual felon. From these judgments, Defendant appeals.

## Peremptory Challenges

[1] In his first argument, Defendant contends that the trial court violated Defendant's Sixth Amendment rights, as set forth in *State v. Ali*, 329 N.C. 394, 407 S.E.2d 183 (1991), by prohibiting him from making final decisions about peremptory challenges when there was an absolute impasse between Defendant and defense counsel regarding peremptory challenges. We disagree.

"[T]actical decisions—such as which witnesses to call, which motions to make, and how to conduct cross-examination—normally lie within the attorney's province." *State v. Brown*, 339 N.C. 426, 434, 451 S.E.2d 181, 187 (1994). " 'However, when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship.' " *Id.* at 434, 451 S.E.2d at 186 (quoting *Ali*, 329 N.C. at 404, 407 S.E.2d at 189). "The attorney is bound to comply with her client's

lawful instructions, 'and her actions are restricted to the scope of the authority conferred.' " *Ali*, 329 N.C. at 403, 407 S.E.2d at 189 (quoting *People v. Wilkerson*, 123 Ill. App. 3d 527, 532, 463 N.E.2d 139, 143-44 (1984)). "In such situations . . . defense counsel should make a record of the circumstances, her advice to the defendant, the reasons for the advice, the defendant's decision and the conclusion reached. *Ali*, 329 N.C. at 404, 407 S.E.2d at 189.

In *State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995), our Supreme Court distinguished *Ali*, reasoning that a disagreement between counsel and the defendant did not rise to the level of an "absolute impasse." In *McCarver*, the testimony of one witness "had a profound effect upon [the defendant,]" *McCarver*, 341 N.C. at 384, 462 S.E.2d at 36, after which the defendant "spoke privately with defense counsel, who . . . stated that defendant 'will not speak.' " *Id.* Counsel for the defendant then explained the following to the court:

> Two or three times this morning [the defendant] wanted me to stop the trial and I refused. Frankly, I was on the edge of my seat wondering if [the defendant] would simply get up and walk out. I'm not saying he's violent or anything like that, but he's just having a hard time hearing it.
>
> I would like the Court to know that, if I may. I will not let [the defendant] run this case. He knows that. He does not control the defense, he can make suggestions. But if his state is so bad, Your Honor, I may stand up at a point and say, "May we have a short recess?"

*Id.* at 385, 462 S.E.2d at 36. Our Supreme Court reasoned that "[a]lthough defense counsel in the present case may have employed a better choice of words in describing the situation at the time, we find no indication in the record of 'an absolute impasse' between the client and the defense team as it concerned trial tactics." *Id.*

Here, too, we believe the record does not indicate " 'an absolute impasse' between the client and the defense team *as it concerned trial tactics.*" *Id.* at 384, 462 S.E.2d at 36 (emphasis added). The evidence concerning an "absolute impasse" cited by Appellant centered on Defendant's dissatisfaction with the fact that Defendant was required stand trial at all, rather than a specific disagreement regarding an exact choice of peremptory challenges.

From the commencement of the trial, Defendant displayed aggressive and abrasive behavior toward the court and his attorney,

regarding the trial process, itself. Specifically, during *voir dire* hearings, Defendant expressed dissatisfaction with defense counsel because he was formerly a prosecutor and because he attempted to persuade Defendant to take a plea bargain. Defendant addressed the court: "Your Honor, they can go ahead and grant my time. I'll come back on appeal[.] . . . Just give me my time now[.]" Regarding the plea bargain, defense counsel explained, "[Defendant] does not want to do the strategy where he would plead guilty [to two charges] . . . [and e]ven though I think it's a good strategy decision, he has the right, the final right on a plea of guilty[.]" The trial court denied Defendant's motion for the discharge or substitution of his court appointed counsel, after which Defendant became violent, declaring, "Your Honor, let me say this for the record; if the man comes near me, I'm going to f— him up; that's point blank. I'm just telling you, if he comes back over here, I'm going to f— him up. He come [sic] back here, I'm going to f— him up." Defendant then cleared the defense table with his hands and threw a laptop computer into the wooden portion of the bar, leaving a significant mar in the wood approximately three inches in diameter. Defendant yelled, "I [will] f— that mother f—— up. Man, just give me my mother f—— time. Give me my mother f—— time. . . . Give me a life sentence. You ain't [sic] scaring me with a life sentence." Defense counsel then stated, "Judge my whole trial is on that laptop and it's gone. My whole trial." After Defendant was taken into custody, he continued to be aggressive, and he was involved in an affray in which he broke his hand. Thereafter, the court "requir[ed] that throughout the trial . . . the defendant [will] have leg shackles on under his pants so that he will not be able to move about[.]"

When court resumed the next day, Defendant again declared, "I don't want to have a trial. I don't want to have the trial period." Defendant stated, "The law don't state [sic] I have to be here because you stated you`can run a trial without me being here." Repeatedly, Defendant argued with the court, stating, "you all run the trial without me being here, you know, that's how I feel. . . . Your Honor, I feel I don't want to be here." Defendant then abruptly stood up, and the bailiff ordered Defendant, "You can have a seat. Sit down[;] sit down. Sit down." Rather than sitting down, Defendant became aggressive and was forced into his seat by several bailiffs; Defendant declared, "Hey, get off me, man."

After a short discussion, the court asked Defendant whether he would "promise not to be disruptive[,]" advising, "[t]his is your trial; your trial, Mr. Williams." Defendant replied, "This y'all [sic] trial."

· Again, Defendant said, "[n]o, I don't want to have no [sic] trial. . . . I ain't—I ain't [sic] coming. I don't want to be here. I don't want to talk no more [sic] about this case period."

The following interaction between the court, defense counsel and Defendant, was put forward by Defendant as evidence of their disagreement regarding peremptory challenges:

Court: All right; so are we ready to bring the jurors in?

[Defense Counsel]: Judge, there's one thing I need to double check before you announce the—before we announce here. I want to make sure I don't mess up my—

Court: Well, you're the one that's going to announce the jurors you want excused.

[Defense Counsel]: Yes, sir.

Defendant: Hey, Your Honor, I need to talk to you. You were saying that—when I was talking to my lawyer, he told me I don't have no say-so over picking a jury. He told me—

[Defense Counsel]: I asked him who he wanted to take off and he said—

Defendant: No, he didn't.

Court: No, that's why we had a recess.

Defendant: I mean, it's like this; I'm not going in front of no jury more dominate Caucasian. I don't want to have a trial. I don't want to have the trial period. I'm not going up in front of no jury if I can't have no say-so who I pick. [sic] . . . That's point blank. You got 132 people out there and it's more dominate Caucasian; you know what I'm saying? If I ain't [sic] satisfied with them or comfortable with them, you know, what I'm saying? It should be everybody have a chance. . . .

Court: Well, I'll give you an opportunity.

Defendant: The State got their chance to pick.

Court: Mr. Williams, let me finish before you interrupt me, please. I took a recess now, because your lawyer wanted to talk to you about the challenges since he's finished his initial *voir dire* of this panel. And have you discussed these potential jurors with your client, [Defense Counsel]?

[Defense Counsel]:  Judge, I told him that I was going to take off four of the jurors and that I always save—I've been stung before in cases where I have exhausted all of my challenges at the beginning. He asked me to take off *ten* of the jurors. I told him I could only take off *six*. I told him strategically that I felt I should only take off four. . . .

Court:  The law says you have six challenges. You can use them however you want to use them throughout the *voir dire* process, and your lawyer and you need to discuss this and, you know, decide how many of these six you want to use at this particular point in the *voir dire*.

Primarily, we note that at this point in the *voir dire*, a final decision regarding peremptory challenges had not been made by either defense counsel or Defendant. Rather, Defendant abrasively ordered defense counsel to dismiss ten jurors—a legal impossibility—and defense counsel strategically advised Defendant that he could dismiss at most six, and that he would advise dismissing only four, saving the remaining two peremptory challenges for later use. This is not evidence, as Defendant argues, of an absolute impasse, because a decision regarding peremptory challenges had not yet been made. After defense counsel advised Defendant that he only had six peremptory challenges, the court again explained to Defendant, "[t]he law says you have six challenges. You can use them however you want to use them throughout the *voir dire* process." A few minutes later, the court again explained, "you can't take ten off; you're limited to six[,]" after which Defendant stated, "I don't want them [sic] six." The record does not reflect to which six Defendant specifically referred, or whether Defendant, in fact, actually referred to six specific jurors. The court then again counseled Defendant that he was limited to six peremptory challenges, and "why don't you discuss [whether to use all six] with [your lawyer]." Defendant replied, referring to Paramour, "[w]hatever six he [sic] talking about, I don't want them[,]" deferring the decision to defense counsel. Despite Defendant's continued combativeness, the court then stated, "I'll give you some time [to talk], if you . . . want it." Defendant twice stated, "No, sir[,]" even though defense counsel asked for "[j]ust one second, Judge."

Defendant again became disruptive and was escorted from the courtroom, after which the court stated the following for the record:

[T]he jury selection continued with the absence of the defendant. The jury was passed by the State to complete the panel of 12. . . . [T]he defendant's counsel, with the absence of the defendant, questioned these four new jurors and hasn't passed on them yet, but I'm going to give [defense counsel] a chance to go and discuss this selection back with his client, who does not want to be here[.]

In the Defendant's absence, defense counsel excused four jurors. The court stated, "now, again, the counsel will have an occasion to talk to the defendant[,]" but Defendant declared that "he didn't want to say anything to [his attorney] about this last four[.]" Defendant was then escorted back into the courtroom, and the court stated, "your lawyer has questioned the four new jurors, but he hasn't made any decision yet as to who he wants to exclude because . . . he wanted to have a chance to talk with you[.]" The court asked, "do you want to talk to your lawyer about the exclusion of these four new jurors?" Defendant replied, "No, sir." When asked a second time, Defendant again said, "No, sir."

Our Supreme Court has held that *Ali* does not apply where there is no indication of an absolute impasse. *See McCarver*, 341 N.C. at 385, 462 S.E.2d at 36. Certainly, we do not dispute that there was an absolute impasse in the instant between Defendant, his attorney and the court. However, we do not believe that the record indicates " 'an absolute impasse' between the client and the defense team *as it concerned trial tactics.*" Rather, the foregoing evidence of record tends to show that the absolute impasse concerned Defendant's ill will toward his attorney and the court regarding the fact that Defendant must stand trial at all. Defendant certainly disagreed with defense counsel's advice regarding the jury selection, but specific disagreement did not rise to the level of an absolute impasse because Defendant ultimately deferred the decision to defense counsel.

We conclude that the following evidence tends to show that Defendant's aggressive, violent and abrasive behavior did not rise to the level of an absolute impasse regarding the specific decision as to peremptory challenges. First, Defendant did not advise defense counsel which six jurors he desired to excuse; in fact, Defendant did not advise defense counsel as to any particular juror he desired to excuse; Defendant tended to show displeasure with the process itself, rather instead of any particular juror in the *voir dire* proceedings; when asked to elaborate in the jury selection process as to which jurors to excuse, Defendant had nothing to add, but deferred to

defense counsel. After Defendant was escorted from the courtroom, due to his disruptive behavior, defense counsel excused only four jurors. The court again stated, "now, again, the counsel will have an occasion to talk to the defendant [regarding which jurors to excuse,]" but given the opportunity to speak, Defendant did not dispute defense counsel's use of four peremptory challenges instead of six, and "didn't want to say anything to [his attorney] about this last four[,]" again deferring decisions in the selection process to defense counsel. After Defendant was escorted back into the courtroom, the court directly stated, "your lawyer has questioned the four new jurors, but he hasn't made any decision yet as to who he wants to exclude because . . . he wanted to have a chance to talk with you[.]" When asked whether he "want[ed] to talk to [his] lawyer about the exclusion of these four new jurors[,]" Defendant replied, "No, sir[,]" deferring the decision defense counsel. In fact, Defendant repeatedly deferred to defense counsel's decision with regard to peremptory challenges, beginning with his initial statement: "[w]hatever six he [sic] talking about, I don't want them[.]" When either defense counsel or the court asked for Defendant's further input in the selection process, Defendant stated multiple times, in his usual combative and contentious manner, that he did not wish to further discuss the selection process at all, thus, deferring the decision to defense counsel.

We conclude that even though the foregoing evidence undoubtedly demonstrates an absolute impasse between Defendant and defense counsel as concerned the necessity, to Defendant's chagrin, that Defendant stand trial at all, the evidence does not demonstrate an impasse "*as it concerned trial tactics*." *McCarver*, 341 N.C. at 384, 462 S.E.2d at 36. This assignment of error is overruled.

Even assuming that an absolute impasse concerning trial tactics existed, *Ali*, 329 N.C. at 403, 407 S.E.2d at 189, further states that "when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decision . . . [t]he attorney is [only] bound to comply with her client's *lawful* instructions[,]" and Defendant's strategy for exercising peremptory challenges was unlawfully discriminatory. *See Georgia v. McCollum*, 505 U.S. 42, 46, 120 L. Ed. 2d 33, 43 (1992) (stating that "the Constitution prohibits a criminal defendant from engaging in purposeful racial discrimination in the exercise of peremptory challenges"); *State v. Locklear*, 349 N.C. 118, 141, 505 S.E.2d 277, 290 (1998) (stating that "discriminatory use of peremptory challenges on the basis of race is forbidden regardless of the respective races of the defendant and of the challenged

jurors"); *see also State v. Robbins*, 319 N.C. 465, 491, 356 S.E.2d 279, 295 (1987) (stating that the excusal of even a single juror for a racially discriminatory reason is impermissible).

Here, Defendant repeatedly stated, "I mean, it's like this; I'm not going in front of no jury more dominate Caucasian[;]" and "[y]ou got 132 people out there and it's more dominate Caucasian; you know what I'm saying?" At a later point in the *voir dire*, Defendant informed the court, "I said [to] my counsel . . . I don't feel represented right [sic] and I could not pick my jury because there wasn't [sic] enough African-Americans up there; half and half, that's what I said." When asked "what [other words] do you want to put in" the waiver of Defendant's right to an appearance before a jury, Defendant stated, "there's not enough African-Americans on the jury." Defendant also stated, "I'm not coming back for no [sic] conviction[,]" after which the court advised, "[you] don't know what's going to happen." Defendant retorted, "Yeah; I know it with ten whites." This statement is especially telling because of Defendant's initial demand that ten jurors be peremptorily challenged.

Defendant essentially concedes racially discriminatory intent in his recommendations to the trial court and to defense counsel regarding the exercise of peremptory challenges. Defense counsel could not have lawfully complied with Defendant's requests, even assuming *arguendo* that the disagreement reached the level of absolute impasse. *Locklear*, 349 N.C. at 141, 505 S.E.2d at 290; *Robbins*, 319 N.C. at 491, 356 S.E.2d at 295. This assignment of error is overruled.

## Motion to Dismiss

**[2]** In his next argument, Defendant contends that the trial court erred in denying Defendant's motion to dismiss the habitual felon indictment. Defendant argues that his habitual felon indictment subjected him to double jeopardy because it resulted in the State's use of 2004 conviction for possession cocaine for two purposes—namely, to support Defendant's current conviction for possession of a firearm by a felon and to support Defendant's sentencing as a habitual felon. Defendant admits that "the Court has decided this issue against him in *State v. Crump*, 178 N.C. App. 717, 722, 632 S.E.2d 233, 235 (2006)[,]" yet nonetheless argues "for preservation for future appellate review." In *State v. Crump*, this Court rejected precisely the same argument Defendant makes in the instant case, holding that the use of a single prior felony conviction as an underlying conviction for a charge of possession of a firearm by a felon and for having attained

habitual felon status does not constitute double jeopardy, explaining that "the mere reliance on the 1998 conviction to establish that defendant was a recidivist for sentencing purposes does not implicate double jeopardy concerns." *Id.* at 722, 632 S.E.2d at 235. This Court is bound by our Court's holding in *Crump.* The trial court did not err by denying Defendant's motion to dismiss the habitual felon indictment. This assignment of error is overruled.

For the foregoing reasons, we find no error.

No Error.

Chief Judge MARTIN and Judge BRYANT concur.